Stephen M. KAILIN, and Linda Kailin, Plaintiffs-Appellants,

v.

Arthur RAINWATER, and Madison Metropolitan School District, Defendants-Respondents,

v.

WISCONSIN STATE JOURNAL, Necessary-Party-Respondent.

Court of Appeals

*No. 98–0870. Submitted on briefs February 1, 1999.—Decided March 31, 1999.*

(Also reported in 593 N.W.2d 865.)

136

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Jon P. Axelrod*, of *DeWitt Ross & Stevens, S.C.* of Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Michael J. Lawton* of *Lathrop & Clark* of Madison. On behalf of the necessary party-respondent, the cause was submitted on the brief of *Jeffrey J. Kassel* and *Robert J. Dreps* of *La Follette & Sinykin* of Madison.

Before Brown, Nettesheim and Anderson, JJ.

NETTESHEIM, J. This is an open records case. The Wisconsin State Journal (WSJ) asked the Madison Metropolitan School District for disclosure of personnel

documents, including an investigative report, relating to Stephen M. Kailin pursuant to the Wisconsin Public Records Law, § 19.31-.37, STATS. Kailin, an elementary school principal, was the subject of an investigation conducted by the District. Following the District's decision to release the records, Kailin appealed to the circuit court pursuant to *Woznicki v. Erickson*, 202 Wis. 2d 178, 549 N.W.2d 699 (1996). The circuit court upheld the custodian's decision to release the records and additionally concluded after a trial de novo that the records should be released. Kailin further appeals to us.[1]

Kailin contends that his privacy and reputational interests outweigh the public interest in disclosure of the records. He also contends that the circuit court erred in considering additional evidence beyond that which was before the custodian. We reject Kailin's arguments. We affirm the circuit court's order authorizing release of the records.

## BACKGROUND

Kailin was a teacher and education administrator for twenty-eight years. He served as the principal of Franklin Elementary School in Madison from 1993 to 1996. On September 16, 1996, Kailin was verbally advised by the District that allegations had been made against him regarding inappropriate contact with certain students. Kailin was directed not to return to the school until further notice.

The District retained Attorney James Ruhly to investigate the allegations. By October 7, 1996, the District had completed its investigation into the allega-

---

[1] Stephen Kailin's wife, Linda Kailin, also appeals the trial court order.

tions. On October 15, it was agreed that Kailin would be reinstated effective November 11, 1996. On October 30, 1996, a WSJ reporter interviewed District Superintendent Cheryl Wilhoyte, Ruhly, Kailin and Kailin's attorney, Bruce J. Rosen, about the matter. On that same day, another Madison newspaper, the Capital Times, ran an article containing a general description of the allegations.[2]

Approximately one week before Kailin was to be reinstated, Rosen received a call from Ruhly requesting a meeting with Kailin and the District. At this meeting, held on November 5, 1996, the District informed Kailin that additional and more serious allegations had been raised which dated back many years. The District denied Rosen's request for information as to the identity of the complainants and for specific factual information about the allegations. The District requested that Kailin respond to the allegations that evening. After meeting with Ruhly, Kailin submitted his written resignation to the District. At that time, his compensation was terminated. He later surrendered his licenses to the Wisconsin Department of Public Instruction.

Ruhly's investigation of the new allegations continued despite Kailin's resignation. Ruhly spoke to the alleged victims and prepared affidavits documenting each victim's account of the alleged incidents. On

---

[2] The Capital Times article contained the following description of the allegations: "[The allegations] included incidents in which [Kailin] read to girls while they were in his lap, or met them at school buses and held their hands. By another account, Kailin would warm up children during the wintertime on school playgrounds by rubbing their bodies." Paul Norton, *Franklin Principal to Be Counseled on Contact With Kids*, CAPITAL TIMES, Oct. 30, 1996, at 1A.

November 18, 1996, Ruhly submitted a confidential report to the Board of Education. The Board held a closed meeting that day pursuant to § 19.85(1)(a), (c), (f), (g), STATS., to discuss the confidential report.

Also on November 18, the District received a letter from WSJ "requesting access to . . . all records accumulated during the course of the initial inquiry (into allegations at Franklin School) and the subsequent investigation regarding complaints of past conduct." The District then hired an additional independent counsel to aid the custodian in reviewing the relevant law and other factors bearing on the decision whether to release the records. In a letter dated November 27, 1996, the custodian of records informed Rosen of the WSJ's request and its decision to disclose Kailin's personnel records.

The custodian wrote: "I am hereby notifying you of my opinion that production of this redacted material is required by law and that Dr. Kailin does have a right to object and/or preclude such production through the judicial process. If Dr. Kailin . . . objects to my decision . . . I am interested in hearing the basis for his objection. After reviewing the basis for your objection I could determine that production is not required." In support of his decision, the custodian cited to the supreme court's decision in *Woznicki*.

On December 5, 1996, Rosen sent a letter to the District again requesting that Kailin be informed of the identities of his accusers. The District informed Rosen that it would not release the identities because Kailin had resigned and would not be proceeding to a hearing. On December 13, 1996, Kailin submitted a written objection to the release of the personnel records setting forth arguments in support of nondisclosure. However, on December 20, 1996, the custodian notified Kailin of

his decision to disclose the records. He stated: "I have determined that under the Wisconsin public records law, as interpreted to date by the Wisconsin Supreme Court and the Court of Appeals of Wisconsin, as the official custodian of [the district's] records, it is my obligation to deliver to [the WSJ] the records which accompany this letter, as redacted where indicated."

Pursuant to *Woznicki,* Kailin appealed the District's decision to the circuit court on January 9, 1997. In a written decision dated February 10, 1998, the circuit court upheld the District's decision. Relying on additional evidence in the form of newspaper articles which the custodian had not considered, the court further held on an independent de novo basis that the records should be released. The court determined "that the public interest in protecting plaintiff Stephen Kailin's privacy and reputational interests does not outweigh the strong public interest favoring disclosure of the course and quality of the investigation, the basis for actions by the School Board including the quality and pattern of the allegations of misconduct by plaintiff. Therefore, plaintiff's request that the court restrain [the custodian] from releasing such records is denied."[3] Kailin appeals.

## DISCUSSION

### 1. *The Open Records Law Generally*

Section 19.31, STATS., sets forth the policy underlying the open records law. It provides that "all persons

---

[3] The circuit court also rejected two additional arguments raised by Kailin: (1) that the records are confidential "pupil records" under § 118.125, STATS., and (2) that the disclosure is barred by the doctrines of attorney/client privilege and attorney work product. Kailin does not raise either argument on appeal.

are entitled to the greatest possible information regarding the affairs of government and the official acts of those officers and employes who represent them." *Id.* Therefore, the open records law "shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business." *Id.* Personnel records are not exempt from disclosure under the public records law. *See Woznicki*, 202 Wis. 2d at 183, 549 N.W.2d at 701. Because the denial of public access is generally contrary to public interest, access may be denied only in exceptional cases. *See* § 19.31; *see also Nichols v. Bennett*, 199 Wis. 2d 268, 277, 544 N.W.2d 428, 432 (1996) (Abrahamson, J., concurring).

■

However, in construing the public records law, our supreme court has observed that "[t]he statutes and case law have consistently recognized the legitimacy of the interests of citizens to privacy and the protection of their reputations." *Woznicki*, 202 Wis. 2d at 185, 549 N.W.2d at 702; *see also Newspapers, Inc. v. Breier*, 89 Wis. 2d 417, 430, 279 N.W.2d 179, 185 (1979) ("[T]here is a public-policy interest in protecting the reputations of citizens."). Therefore, prior to the release of records, the custodian has a duty to consider all the relevant factors in balancing the public interest and the private interests. *See Woznicki*, 202 Wis. 2d at 191, 549 N.W.2d at 705. Then, the custodian "must weigh the competing interests involved and determine whether permitting inspection would result in harm to the public interest which outweighs the legislative policy recognizing the public interest in allowing inspection." *See id.* at 192, 549 N.W.2d at 705 (quoting *Newspapers, Inc.*, 89 Wis. 2d at 427, 279 N.W.2d at 184).

## 2. Woznicki v. Erickson

Since Kailin's appeal to the circuit court was brought pursuant to *Woznicki v. Erickson,* we first speak to that case. While *Woznicki* has been cited in a few cases, *see Klein v. Wisconsin Resource Ctr.,* 218 Wis. 2d 487, 490, 582 N.W.2d 44, 45 (Ct. App.), *review denied,* 219 Wis. 2d 923, 584 N.W.2d 123 (1998); *Milwaukee Teachers' Educ. Ass'n v. Milwaukee Bd. of School Dirs.,* 220 Wis. 2d 93, 95, 582 N.W.2d 122, 123 (Ct. App.), *review granted,* 220 Wis. 2d 363, 585 N.W.2d 156 (1998), this is the first case in which a more thorough analysis of its procedures is necessary.

We analyze *Woznicki* in three discussions. First, we discuss the trial court procedure that *Woznicki* mandates. Second, we address the standard of review the circuit court must apply. Third, we address our appellate standard of review.

### a. The Trial Court Procedure

In *Woznicki,* the State dismissed a sexual assault charge against Woznicki. *See Woznicki,* 202 Wis. 2d at 182, 549 N.W.2d at 701. During the course of the investigation, the district attorney obtained certain of Woznicki's personnel records and his personal telephone records. *See id.* After the dismissal of the criminal charges, Woznicki's current employer and the alleged victim's father sought these records from the district attorney under the open records law. *See id.* The district attorney notified Woznicki that he intended to release the records. In response, Woznicki sought an injunction from the circuit court. The court rejected the request. Upon review, the court of appeals held that personnel records of public employees were exempt from disclosure under the public records law.

The court also held that Woznicki's telephone records were exempt from disclosure because they were private records. *See Woznicki v. Erickson*, 192 Wis. 2d 2d 710, 713, 531 N.W.2d 465, 466 (Ct. App. 1995), *rev'd*, 202 Wis. 2d 178, 549 N.W.2d 699 (1996).

Upon further review, the supreme court reversed the court of appeals decision. *See Woznicki*, 202 Wis. 2d at 181, 549 N.W.2d at 701. First, the supreme court ruled that the public records law does not provide a blanket exception for public employee personnel records or telephone records in the custody of a public custodian. *See id.* at 183–84, 549 N.W.2d at 701–02. Second, and germane to this case, the supreme court noted that although the open records law provides mandamus relief to a record requester when a custodian refuses to release a record, the law provides no such "parallel action through which an individual may seek to compel the custodian to deny access to public records." *See id.* at 184–85, 549 N.W.2d at 702. To protect the privacy and reputational interests of the target of the records, the court grafted onto the open records law an additional procedure. The court held that prior to release of the records, the custodian must first notify the target of the release decision and then allow the target a reasonable amount of time to appeal the decision to the circuit court. *See id.* at 193, 549 N.W.2d at 705.

Pursuant to *Woznicki*, the role of the circuit court in this review process is two-pronged. First, the court must determine if the custodian performed the appropriate balancing test in deciding to release the records. Second, if the custodian acted correctly, the court must then review de novo the decision of the custodian. *See id.* at 195, 549 N.W.2d at 706.

## b. The Circuit Court's Standard of Review

Next we consider the circuit court's standard of review under *Woznicki*. At first blush, the two-pronged process gave us pause because case law at the time of *Woznicki* already established a de novo standard of review of a custodian's open records decision. *See Newspapers, Inc.*, 89 Wis. 2d at 428, 279 N.W.2d at 184. In fact, *Woznicki* itself acknowledged that this was the state of the law. *See Woznicki*, 202 Wis. 2d at 192, 549 N.W.2d at 705. Were we to read *Woznicki* literally in light of this law, the circuit court would be performing the same de novo exercise twice. That obviously would make no sense.

To avoid this result, we read *Woznicki* to mean that the second tier of the circuit court's de novo review requires the court to conduct an independent review, akin to a trial de novo which permits the taking of additional evidence. This reading of *Woznicki* is supported by the supreme court's further observation that the circuit court proceeding will allow the individual to present arguments to the court that the custodian did not consider. *See id.* at 191, 549 N.W.2d at 704.

The circuit court's interpretation of *Woznicki* is in accord with ours. Prior to the trial in this case, WSJ sought permission to supplement the record with certain newspaper articles about Kailin and the accusations. Kailin objected to this effort. In allowing WSJ's additional evidence, the court wrote:

> I conclude that the Wisconsin Supreme Court in *Woznicki* created a cause of action for citizens whose privacy and reputation interests are adversely affected by the release of public records that is the "mirror image" of the statutory mandamus action vested in a requester under

§ 19.32(1)(a), STATS., whose request for release of open records has been denied. In each cause of action, the court is to make a *de novo* determination of the legal question as to whether permitting inspection would result in harm to the public interest which outweighs the strong legislative policy in favor of allowing inspection of all public records.

Because of the *de novo* determination of the question of law involved, the trial court may consider all relevant and material information brought to its attention by the parties, *even in a trial*, regardless of whether that information was before the records custodian . . . . Even in *Woznicki*, the Wisconsin Supreme Court contemplated that the parties may well present arguments to the court that the records custodian did not consider. [Citations omitted; emphasis added.]

We fully agree with the circuit court's analysis of *Woznicki*, and we can say it no better.

### c. Appellate Standard of Review

Next, we address our appellate standard of review. As to the custodian's decision, the law is clear that both the circuit and appellate courts conduct their reviews under the de novo standard. *See Newspapers, Inc.*, 89 Wis. 2d at 428, 279 N.W.2d at 184 ("[I]t is the duty of this court, as it was for the trial court, to determine as a matter of law whether the custodian's stated reasons show that inspection would cause harm to the public interest which outweighs the presumptive public interest in allowing inspection.").

As to the circuit court's independent trial de novo review under the second prong of *Woznicki*, we conclude that our review should be conducted under the

146

usual standards applicable to a trial conducted in the circuit court. Thus, we will apply the appropriate standard, depending on whether the question is one of fact, law or discretion.

■ In this particular case, although the parties hotly dispute the correctness of the trial court's decision, they do not contest the historical facts. Moreover, although the circuit court received additional evidence in the form of the newspaper articles, the parties did not offer any testimony. Therefore, we are not confronted with questions of witness credibility. In summary, we are applying the Public Records Law as written by the legislature and as broadened by *Woznicki* to the undisputed facts. That presents a question of law which we review de novo. *See State ex rel. Blum v. Board of Educ.,* 209 Wis. 2d 377, 381, 565 N.W.2d 140, 142 (Ct. App.), *review denied,* 210 Wis. 2d 47, 565 N.W.2d 537 (1997). Under that standard, we are not required to give deference to the circuit court's decision. *See Scheunemann v. City of West Bend,* 179 Wis. 2d 469, 475, 507 N.W.2d 163, 165 (Ct. App. 1993). However, despite our de novo standard of review, we nonetheless value a trial court's decision. *See id.* Here, although we disagree with the circuit court on one point which we will address later, the court has otherwise provided us with a thorough, well-reasoned and well-stated written decision which we have found helpful in conducting our review.

We now turn to Kailin's appellate issues.

### 3. The Newspaper Articles as Evidence at the De Novo Trial Hearing

■ The foregoing analysis of *Woznicki* dictates that we must reject Kailin's contention that the circuit court improperly allowed newspaper articles to be added to the record that was before the custodian. Instead, the court judicially noticed the articles. As we have explained, the second prong of the *Woznicki* review process allows the circuit court to conduct the equivalent of a trial de novo, including the taking of additional evidence. We explain further why this is logical and necessary.

The circuit court allowed WSJ to supplement the record with thirty-eight newspaper articles devoted to the Kailin matter. The articles contain general accounts of both the initial allegations and the later, more serious, allegations against Kailin. WSJ offered the articles to demonstrate that information regarding the accusations against Kailin was already in the public domain and that Kailin's reputational interests had already been adversely affected.

This additional evidence was very germane to the critical task before the circuit court—the balancing of Kailin's privacy and reputational interests against the public policy in favor of disclosure. When performing that balancing test, it would be nonsensical for the circuit court (and us) to ignore information concerning Kailin and these events that was already known to the public. Kailin would have us ignore the reality of this situation. But we cannot "un-ring the bell."

Pursuant to *Woznicki*, we hold that the circuit court properly allowed this additional evidence.

### 4. The District's Procedure

Kailin contends that the District denied him due process and a meaningful opportunity to be heard by refusing to divulge the names of his accusers. Kailin argues that by doing so, "the District denied [him] the opportunity 'to defend' himself before his reputation was damaged. . . . This, in turn, prevented counsel from being able to persuade the District or the trial court, as contemplated by *Woznicki*, that disclosure should be denied because the allegations were not credible."

We begin our discussion of this issue by noting our lone disagreement with the circuit court's decision. Agreeing with the District, the court ruled that Kailin had waived his opportunity to learn the names of his accusers by resigning instead of challenging any disciplinary action which the District might take. The court said:

> Kailin's choice to resign immediately . . . placed the identity of the complainants outside of his reach. . . . Devices to learn of their identities and specific statements, to investigate their credibility and motives, to challenge their statement under oath, and to present contrary information were all available to [Kailin], but for his act of resignation.

*Woznicki* stresses the importance of an individual's privacy and reputational interests. *See Woznicki,* 202 Wis. 2d at 187–95, 549 N.W.2d at 703–06. We view these interests as separate, distinct and markedly different from employment interests. Had Kailin contested any discipline that the District might have sought to impose, the resulting proceedings would have been concerned with Kailin's rights or interests in his continued employment, not his privacy or reputational

149

interests. Kailin's decision to resign might have been due to a variety of factors such as the emotional or economic consequences of continuing to contest the matter, the desire to avoid further public embarrassment to himself or his family, or the simple decision to put the matter behind him. But we cannot read into that decision a conscious and intended forfeiture by Kailin of his important privacy and reputational interests. Waiver is a "voluntary and intentional relinquishment of a known right." *Bank of Sun Prairie v. Opstein*, 86 Wis. 2d 669, 681, 273 N.W.2d 279, 284 (1979). We hold that Kailin did not waive his privacy and reputational interests by choosing to resign.

However, our disagreement with the circuit court on this point does not prompt us to conclude that the custodian's decision was wrong. The court's decision recites an abundance of factors that well support the custodian's decision to release the records. We adopt the court's decision in this regard.[4]

---

[4] The circuit court's decision does not expressly break out into the two separate discussions under the two-pronged review contemplated by *Woznicki v. Erickson*, 202 Wis. 2d 178, 549 N.W.2d 699 (1996). However, in fairness to the court, it does not appear that the parties presented the case in a fashion which called for such a bifurcated discussion.

Furthermore, in upholding the custodian's decision, the circuit court's decision clearly addresses all the factors that were presented to the custodian. In addition, the court's decision addresses the additional evidence that was presented at the circuit court level and, in conjunction with the evidence that was before the custodian, the court independently determined that the records should be released. Thus, despite the circuit court's "consolidated" discussion, we are able to separately discuss the issues under the two-pronged approach mandated by *Woznicki*.

The circuit court acknowledged that the accusations against Kailin were stale and that, in some instances, memories could be falsely reconstructed. However, in this case, the court noted the factors which augured against those concerns. We recite the circuit court's summation of the evidence on this point:

> Concerns about reconstructed and false memories of reported sexual abuse after many years are well-known and have been found to be well-founded in some instances. However, the number of reports of misconduct in this case (five individuals reporting of sexual touching, and six instances of conduct consistent with "grooming" behavior spanning a period of 28 years up until the Fall of 1996), the consultation by independent counsel with a sexual abuse expert regarding the credibility of the content of the various independent reports, the existence of corroboration of several complainants in the form of intervening reports to parents, therapists and personal confidants, and the consistency of the reports regarding the ages of the reported victims and circumstances and nature of the reported conduct add significantly to the reliability of the reports, notwithstanding the long span of years covered and the time elapsed since the earliest reported conduct. The record cannot be disregarded as unreliable on the grounds of staleness or confabulation. The consistency, number and mutually corroborating nature of the reports undermines the argument that it is unfair to disclose the documents because of the unreliability of information contained therein.

In support of the custodian's decision to release the report, the circuit court also cited to the strong public policy that favors inspection of public records unless there is a clear statutory exception, a recognized limitation on disclosure under the common law, or an

overriding public interest in keeping the record confidential. *See Hathaway v. Joint Sch. Dist. No. 1*, 116 Wis. 2d 388, 397, 342 N.W.2d 682, 687 (1984). The court also noted that the public interest in the case was generated not only by concerns that the District may have put some of its students at risk because of Kailin's employment, but also by concerns that Kailin had perhaps not received fair and impartial treatment by the District during the investigation. The court observed that the public "continues to lack sufficient information to reach either closure or judgments on the questions."

Besides the anonymity of the accusers and the staleness of the allegations, the circuit court considered Kailin's additional arguments. These included: (1) the lack of criminal proceedings, (2) Kailin's reliance on Ruhly's representations that his resignation would halt the investigation, and (3) Kailin's resignation and surrender of his licenses. We address each in turn.

Kailin contends that the lack of criminal proceedings resulting from his alleged conduct supports nondisclosure. However, the later, and more serious, allegations in this case concern events well after the statute of limitations had expired for the bringing of criminal charges. Moreover, Kailin does not provide any meaningful argument as to how this factor truly bears on the balancing test before us. If this factor is relevant, it is only minimally so.

Nor do we view Ruhly's representations that there would be no written report if Kailin resigned as truly relevant to the balancing test. Ruhly made this representation in the context of the original, not the later investigation. When the more serious allegations surfaced and Kailin resigned, there was much public concern as to the veracity of the accusations and the integrity of the District's investigation.

Kailin contends his resignation and license surrender detract from the public interest in the investigation. However, the articles and editorials generated during the investigation and after his resignation indicate that the public interest in the investigation did not wane. To the contrary, Kailin's resignation raised additional questions regarding the District's investigation. These were well summarized by the trial court in its written decision:

> Notwithstanding the traumatic resignation by Stephen Kailin, the public, as reflected in the media accounts, continues to lack sufficient information to reach either closure or judgments on questions like the following: Was Stephen Kailin, an historically highly regarded administrator in many quarters, "railroaded" into resigning by the School District? Did the School District investigate allegations of misconduct by Stephen Kailin fairly and impartially? Can other administrators and teachers expect to be treated fairly in an investigation by the School District of complaints/ concerns regarding alleged misconduct, particularly of a sexual nature, towards pupils? Is there any credible evidence of an anonymous conspiracy by staff at Franklin Elementary School or by others to force Stephen Kailin out as principal? What choices did Stephen Kailin have during the investigation? What choices did he make? Did the Board act properly to protect the rights of Stephen Kailin? Did the Board act properly to protect the welfare of the children enrolled at Franklin Elementary School and in the Madison Public School System? All of these issues transcend the resignation and license surrender by Stephen Kailin.

While Kailin's resignation and license surrender certainly weigh in his favor, to leave the public's ques-

tions concerning the District's investigation unanswered would run contrary to the policy underlying the open records law. *See* § 19.31, Stats. ("[A]ll persons are entitled to the greatest possible information regarding the affairs of . . . the official acts of those officers and employes who represent them.").

In the final analysis, the circuit court concluded that factors in support of the custodian's decision to release the documents transcended the reasons proffered by Kailin against release of the documents. With the exception of the court's waiver ruling, we otherwise fully endorse and adopt the court's decision. After reviewing this question de novo, we uphold the custodian's decision to release the records.[5]

---

[5] Kailin also contends that we should not look to the reasons cited by the circuit court in support of the custodian's decision because the custodian did not cite to these reasons in his letter stating that he intended to release the records. Kailin relies on our decision in *Village of Butler v. Cohen*, 163 Wis. 2d 819, 825, 472 N.W.2d 579, 581 (Ct. App. 1991), where we said, "A primary reason for requiring the custodian to state specific policy reasons for refusal is to provide the court with a basis for its review." Without such information, the trial and appellate courts have to "hypothesize the reasons for denying access or to consider reasons not asserted by the custodian." *Oshkosh Northwestern Co. v. Oshkosh Library Bd.*, 125 Wis. 2d 480, 486, 373 N.W.2d 459, 463 (Ct. App. 1985).

But this is not a case in which we are left to wonder why the custodian rejected Kailin's request to not release the records. To the contrary, this case is replete with information on this point. After the custodian announced his initial decision to release the records and provided Kailin notice of such intent pursuant to *Woznicki*, Kailin and the District engaged in protracted discussions and negotiations on the question. These are well documented in the record. The custodian's later decision to

## 5. The Circuit Court's Independent De Novo Review

Finally, we turn to the second level of the circuit court's review under *Woznicki*—the court's trial de novo consideration of the issue. As we have already noted, the facts in this case are undisputed and there are no witness credibility issues before us. Therefore, we review this question de novo as a matter of law, mindful that the circuit court's decision can prove helpful. *See Scheunemann*, 179 Wis. 2d at 475, 507 N.W.2d at 165.

Much of what we have already said governs our holding on this issue. Based upon the record before the custodian, we have already determined that the custodian's decision to release Kailin's records was proper. In reviewing the circuit court's trial de novo ruling, we utilize not only that same record, but also the additional evidence of the newspaper articles. Those articles reveal that much of the damaging information concerning the allegations against Kailin is already in the public domain. That obviously cuts against Kailin's claim that his privacy and reputational interests outweigh the public interest in disclosure of the records. Since we have concluded that the custodian correctly decided to release the records, it logically follows that we must also conclude that the circuit court correctly decided to release the records because the only additional evidence on the question supports the argument for release of the records.

In reviewing this question, we bear in mind our supreme court's statement in *Wisconsin Newspress,*

---

stand by his decision to release the records carries the clear, if unspoken, message that he was rejecting the reasons cited by Kailin against release.

*Inc. v. School District*, 199 Wis. 2d 768, 546 N.W.2d 143 (1996):

> [T]his legislative policy of not disclosing data which may unduly damage reputations carries over to the field of inspection of public records and documents. . . . As applied to inspection it does not bar all inspection of public records and documents that might damage reputations, but requires a balancing of the interest of the public to be informed on public matters against the harm to reputations which would likely result from permitting inspection.

*Id.* at 777–78, 546 N.W.2d at 146 (quoting *State ex rel. Youmans v. Owens*, 28 Wis. 2d 672, 685, 137 N.W.2d 470, 476 (1965)).

We acknowledge, as did the trial court, that prior to the allegations at issue in this case, Kailin was a highly respected educator. He received many honors including the Distinguished Service Award from the District and the Principal of the Year award. As such, he has a significant interest in protecting his reputation. However, we conclude that this interest has been significantly lessened in light of the information concerning the alleged assaults which has already been disseminated to the public by the media without any complicity by the District.

The record on appeal contains thirty-eight published newspaper articles and editorials discussing the Kailin investigation. The articles contain references to "allegations [that Kailin] sexually assaulted three schoolgirls several years ago" and statements such as, "No evidence has been released to the public on allegations that Kailin—who has never admitted guilt—had sexual contact in the 1980s with as many as seven girls

between kindergarten and fifth grade." While the Confidential Report contains more detailed accounts of the alleged assaults, the fact remains that the public has already been informed that the assaults allegedly occurred and that Kailin is the accused.

In light of the articles already published and the undeniable damage that has already been done to Kailin's reputation, we conclude that Kailin's reputational interests do not outweigh the public interest in disclosure of the investigative report. While it may have been unfair to Kailin that the media have chosen to report the results of their investigative reporting, this is not the fault of the District. As noted earlier, we cannot erase this history.

■■■

We conclude that the factors in this case weigh on the side of disclosure. Therefore, this case does not present the exceptional circumstances required to overcome the presumption in favor of open records. *See* § 19.31, STATS. Based upon a de novo review of the circuit court's independent determination to release the records, we affirm the court's ruling.

## CONCLUSION

Reviewing de novo both the custodian's and the circuit court's decisions to release Kailin's records, we conclude that the public interest in disclosure of the records outweighs Kailin's privacy and reputational interests. We further conclude that the circuit court properly received additional evidence as it discharged its trial de novo responsibilities pursuant to *Woznicki*.

*By the Court.*—Order affirmed.