755 A.2d 583

ANA ROCCI, PLAINTIFF–APPELLANT, v. ECOLE SECONDAIRE
MACDONALD–CARTIER, A FOREIGN ENTITY AND EDWARD
TILLI, DEFENDANTS–RESPONDENTS, AND JAVIER MATI-
ACCI RODRIGUEZ AND JOHN DOE (1–10), DEFENDANTS.

Argued February 15, 2000—Decided August 1, 2000.

*Jacqueline R. Rocci,* argued the cause for appellant.

*Michael T. Kearns,* argued the cause for respondent (*Hoagland, Longo, Moran, Dunst & Doukas,* attorneys; *Donald D. Davidson,* of counsel).

*Thomas J. Cafferty,* argued the cause for *amicus curiae,* New Jersey Press Association (*McGimpsey & Cafferty,* attorneys; *Mr. Cafferty* and *Arlene M. Turinchak,* on the briefs).

The opinion of the Court was delivered by

VERNIERO, J.

In this appeal we consider the application of the doctrine of presumed damages to a claim of defamation asserted by plaintiff, a teacher. The claim centers on a letter by defendant, also a teacher, in which defendant asserts that plaintiff behaved unprofessionally on a class trip. The Appellate Division affirmed the Law Division's grant of summary judgment, holding that plaintiff did not establish a claim of defamation because she did not proffer proof of reputational or pecuniary harm. 323 *N.J.Super.* 18, 731 *A.*2d 1205 (1999).

We affirm but for reasons different from those expressed by the Appellate Division. We conclude that defendant's letter, which concerns a teacher's behavior around her students and was sent only to that teacher's supervisor, requires heightened free-speech protections. In view of that conclusion, we hold that reputational or pecuniary harm may not be presumed in this case absent a showing of "actual malice" as that term is defined under *New York Times v. Sullivan,* 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706 (1964). Because plaintiff was unable to show such harm and has alleged no facts sufficient to demonstrate actual malice, the grant of summary judgment was appropriate in this case.

## I.

Plaintiff Ana Rocci and defendant Edward Tilli are teachers who in 1995 took students on a trip to Spain. Rocci, a teacher at St. Joseph's High School in Metuchen, accompanied twenty-three students from that school. She and the St. Joseph's students joined Tilli, a teacher at École secondaire Macdonald–Cartier

High School (École secondaire) of Ontario, Canada, and ten students from that school. Together, the group toured through Spain.

After the trip, on May 9, 1995, Tilli wrote a letter to the principal of St. Joseph's High School, complaining that, among other things, Rocci had consumed seven bottles of wine on the plane and acted unprofessionally during the trip by keeping the students out late:

My name is Ed Tilli and I am a teacher at Macdonald Cartier High School.... In all my years of experience as a teacher and counsellor I have had to deal with very few problems in comparison with this years [sic] Spain experience.

As you may already know this years [sic] adventure was a joint canadian-american [sic] school trip. Our ten students of which [sic] eight girls and two boys teamed up with your twenty-three boys excluding the adults. As such, this experience would have benefited [sic] all students if it were not for the unfortunate lack of professionalism on the part of Mrs. A. Rocci. If I may I would now like to relate to you both our personal experiences with her as well as those of Javier Matiacci Rodriguez (the E.F. Tour Guide during the Spain visit).

*Thursday, April 13*

As related by the Tour Guide the [sic] and students, Mrs. Rocci had had seven bottles of wine on the flight from J.F.K. to Amsterdam. This was to set the tone for things to come. That very same evening fully aware that the next day we were to get up at 7:00 a.m. for the Madrid guided tour, Mrs. Rocci kept her students, with some of ours, out until 2:00 a.m. This would make it very difficult for the students to stay awake and remain focused that day.

*Friday, April 14*

On the way to Toledo, being overtired, the students did very little listening if any at all....

We were ... told by our E.F. Tour Guide that Mrs. Rocci (forgetting that we were all equal paying customers) felt that because she had the majority number of students that she could therefore make all decisions for both groups.

. . . .

Once again, that evening your students were kept out until 2:30 a.m. while being fully aware of the 7:00 a.m. wake-up call and early departure to Segovia.

. . . .

*Monday, April 17*

. . . .

In the evening your students were forced out until 1:30 a.m. and were scheduled to get up and leave for Tangiers, Morocco at 4:30 a.m. As usual the students were very tired and had difficulties in enjoying Tangiers. (Information related by both students and Tour Guide).

Plaintiff commenced an action for defamation against Tilli, École secondaire, tour guide Javier Matiacci Rodriguez, and ten unnamed defendants. Rodriguez and the unnamed defendants are not represented in this litigation. Additionally, although Rodriguez was identified as a defendant, plaintiff's complaint alleged no claims against Rodriguez. 323 *N.J.Super.* at 21 n. 1, 731 *A.*2d 1205.

In her complaint, plaintiff alleged the following damages: "loss of earnings and grievous mental injury in that she was exposed to the contempt and ridicule of her friends and acquaintances and was rendered outraged in mind, spirit and body, to the extent that she required prolonged medical treatment to restore her health." However, at her deposition, plaintiff stated that she was neither fired nor suspended from her teaching position and that she did not suffer any economic damages. She further stated that after the letter arrived at her school she met with the principal and, using information provided by her colleagues and students, she proved the falsity of the statements to the principal. Although she attributed a digestive ailment to anxiety she experienced after receiving the letter, plaintiff stated that she did not incur medical expenses related to the alleged defamation. Finally, plaintiff testified that she was upset by students' inquiries about the wine she allegedly drank on the airplane, but she acknowledged that she showed the letter from Tilli to the students in an effort to have them discredit Tilli's accusations.

On motion by defendants Tilli and École secondaire, the Law Division granted summary judgment in favor of defendants. That court concluded that Tilli's letter was not defamatory, and also noted that plaintiff had not alleged pecuniary damages. Although the Appellate Division acknowledged that the letter could be defamatory and concluded that plaintiff's European undertaking with her students did not implicate a public interest, 323 *N.J.Super.* at 22, 731 *A.*2d 1205, it affirmed the trial court's disposition. Citing this Court's decision in *Sisler v. Gannett Co.*, 104 *N.J.* 256, 280, 291, 516 *A.*2d 1083 (1986), the panel held that to maintain a

claim of defamation under New Jersey common law a plaintiff must prove that her reputation has been injured, that she suffered pecuniary loss, or that she suffered extreme emotional distress. 323 *N.J.Super.* at 23–24, 731 *A.*2d 1205. One member of the panel dissented. The dissenting member, relying on the doctrine of presumed damages, concluded that proof of actual harm is not a prerequisite to plaintiff's right to recover damages. *Id.* at 27, 731 *A.*2d 1205 (Lesemann, J.S.C., dissenting). Plaintiff appealed to this Court as of right pursuant to *Rule* 2:2–1(a)(2).

Following oral argument, we afforded the parties the opportunity to submit supplemental briefs concerning whether defendant Tilli's letter implicated the public interest. In response, the parties, as well as the New Jersey Press Association as *amicus curiae,* submitted briefs in which they discussed that question. Defendants Tilli and École secondaire contend that because Tilli's letter implicated the public interest, plaintiff could not presume damages and would have to prove actual malice to sustain her suit. In contrast, plaintiff argues that, although the letter implicated a matter of public concern, she should be permitted to present her case to the jury to demonstrate that defendants were motivated by malice.

## II.

"The law of defamation embodies the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks." *Swede v. Passaic Daily News,* 30 *N.J.* 320, 331, 153 *A.*2d 36 (1959). The law, however, is not without its limits. Defamation-law principles must "achieve the proper balance between protecting reputation and protecting free speech." *Ward v. Zelikovsky,* 136 *N.J.* 516, 528, 643 *A.*2d 972 (1994). In that regard, "speech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.'" *Sisler, supra,* 104 *N.J.* at 264–65, 516 *A.*2d 1083 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 *U.S.* 749, 758–59, 105 *S.Ct.* 2939, 2945, 86 *L.Ed.*2d 593, 602 (1985)).

The same is true under our State Constitution. *Id.* at 271–72, 516 *A*.2d 1083 ("[O]ur decisions, pronounced in the benevolent light of New Jersey's constitutional commitment to free speech, have stressed the vigor with which New Jersey fosters and nurtures speech on matters of public concern.").

In the same vein, speech related to matters of public concern "occupies the 'highest rung of the hierarchy of First Amendment values[.]' " *Dun & Bradstreet, supra,* 472 *U.S.* at 759, 105 *S.Ct.* at 2945, 86 *L.Ed.*2d at 602 (quoting *Connick v. Myers,* 461 *U.S.* 138, 145, 103 *S.Ct.* 1684, 1689, 75 *L.Ed.*2d 708, 718 (1983)). Such speech "requires maximum protection." *Sisler, supra,* 104 *N.J.* at 266, 516 *A.*2d 1083. Thus, when alleged defamatory remarks touch on a matter of public concern, "the interests of free speech justify, and fairness to individual reputation permits, application of a strict and high burden of proof to establish actionable defamation." *Id.* at 275, 516 *A.*2d 1083. Within that context, a plaintiff asserting a defamation claim cannot rely on the doctrine of presumed damages absent a finding that the defendant published the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times, supra,* 376 *U.S.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706.

Applying those tenets here, we are satisfied that plaintiff may not rely on the doctrine of presumed damages. There is a strong public interest in the behavior of teachers, especially concerning their conduct with and around their students. *DiCosala v. Kay,* 91 *N.J.* 159, 180, 450 *A.*2d 508 (1982) (recognizing high degree of care required to be exercised toward children when adult's employment involves contact with children); *cf. Standridge v. Ramey,* 323 *N.J.Super.* 538, 545, 733 *A.*2d 1197 (App.Div.1999) ("[P]erformance of high school athletic teams is often a matter of substantial public interest within a community."). Similarly, the Supreme Court of Connecticut has observed, "[u]nquestionably, members of society are profoundly interested in the qualifications and performance of the teachers who are responsible for educating

and caring for the children in their classrooms." *Kelley v. Bonney,* 221 *Conn.* 549, 606 *A.*2d 693, 710 (1992).

In her supplemental brief, plaintiff acknowledges that defendant's letter implicates a matter of public concern. More specifically, she states that her "role was one as a fiduciary charged with the care of her students. On its face, the letter appears to concern itself with the students [sic] well being." In view of that fiduciary role and the public interest, we believe that there must be free discourse, commentary, and criticism regarding a teacher's professionalism and behavior during a school-sponsored event. That principle, which is at the heart of this case, tips the scale in favor of requiring plaintiff to allege more than mere embarrassment to survive summary judgment. Hence, although a private figure, plaintiff is required to allege and prove pecuniary or reputational harm.

Moreover, teachers are aware that they will be subject to evaluation by members of their school boards, administrators, peers, parents, and students. *In re L.R.,* 321 *N.J.Super.* 444, 452, 729 *A.*2d 463 (App.Div.1999) ("The most obvious available measure to protect students from a teacher who poses a danger to their safety or welfare is for [Division of Youth and Family Services] to communicate its concerns and recommendations to the school district which employs the teacher."). Accordingly, we must ensure that our jurisprudence does not act to chill complaints about a teacher's behavior in the presence of students or similar matters involving the public interest. *Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 *N.J.* 125, 157, 516 *A.*2d 220 (1986) ("[T]he fear of [being sued for defamation] can inhibit comment on matters of public concern."); *cf. Givhan v. Western Line Consol. Sch. Dist.,* 439 *U.S.* 410, 99 *S.Ct.* 693, 58 *L.Ed.*2d 619 (1979) (holding it improper to terminate teacher due to her complaints and criticism of school policies and practices communicated privately to principal; teacher's complaints were protected by First Amendment); *Kailin v. Rainwater,* 226 *Wis.*2d 134, 593 *N.W.*2d 865 (Ct.App. 1999) (explaining public interest in disclosure of principal's records

of misconduct outweighed principal's privacy and reputational interests).

### III.

This Court has previously determined that summary judgment is particularly appropriate for disposing of non-meritorious defamation suits. *Costello v. Ocean County Observer*, 136 *N.J.* 594, 605, 643 *A.*2d 1012 (1994); *Sedore v. Recorder Publ'g Co.*, 315 *N.J.Super.* 137, 163, 716 *A.*2d 1196 (App.Div.1998) (urging "trial courts not to hesitate to employ summary judgment to expedite such litigation whenever appropriate"). New Jersey courts "have recognized that First Amendment values are compromised by long and costly litigation in defamation cases." *Sedore, supra*, 315 *N.J.Super.* at 163, 716 *A.*2d 1196 (citing *Kotlikoff v. The Community News*, 89 *N.J.* 62, 67, 444 *A.*2d 1086 (1982); *Maressa v. New Jersey Monthly*, 89 *N.J.* 176, 196, 445 *A.*2d 376, *cert. denied*, 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982)). "By discouraging frivolous defamation actions, motions for summary judgment keep open lines of communication to the public on" matters of public concern. *Dairy Stores, supra*, 104 *N.J.* at 157, 516 *A.*2d 220.

■ In this case, plaintiff failed to allege any specific harm to her reputation; instead, she felt embarrassed each time her students teased her about drinking alcohol. She was also concerned that others would find out about the letter, stating "you know how kids are." However, the students learned of the letter's contents only after plaintiff herself distributed the letter to them. In contrast, defendant sent the letter directly and privately to plaintiff's principal. As stated at her deposition, plaintiff's only claim of harm is embarrassment caused by her own distribution of the letter. Although we do not diminish the sense of embarrassment asserted by plaintiff, plaintiff should not be able to recover for that embarrassment when she herself caused the material to be distributed.

Moreover, plaintiff incurred no medical expenses for her alleged health problems and did not miss any work due to her asserted

ailments. Apparently, plaintiff did not go to a gastroenterologist regarding her claimed digestive problems until the day before her deposition, well after she asserted in her complaint that she required "prolonged medical treatment." Likewise, plaintiff suffered no pecuniary harm—she did not lose her job, suffer any form of discipline, or miss any days of work. Plaintiff continued to be permitted to chaperone European trips and did not suffer any loss associated with any other job.

In view of the record, the trial court appropriately disposed of plaintiff's case on summary judgment. The alleged defamatory material involves a matter of public concern, which is at the heart of the First Amendment and thus requires enhanced protection. We do not believe that in such a setting a plaintiff should be able to survive a motion for summary judgment when she has failed to provide any evidence of harm beyond her embarrassment. *Sisler, supra,* 104 *N.J.* at 281, 516 *A.*2d 1083.

Lastly, in *Costello, supra,* 136 *N.J.* at 615, 643 *A.*2d 1012, we made clear that under the heightened actual-malice standard,

[p]laintiffs ... must produce substantial evidence to survive a motion for summary judgment. Although courts construe the evidence in the light most favorable to the non-moving party in a summary judgment motion, the "clear and convincing" standard in defamation action adds an additional weight to the plaintiffs' usual "preponderance of the evidence" burden.

[Citation omitted.]

As noted, plaintiff has alleged insufficient facts in her complaint and deposition testimony to demonstrate that defendant Tilli knew that the information relayed to him by the tour guide and students was false, or that defendant otherwise acted with reckless disregard of the truth. Thus, "[a]pplying the actual-malice standard through the prism of summary judgment, we find that even when considering the evidence in the light most favorable to [plaintiff], a reasonable factfinder could not find 'clear and convincing' evidence of [defendant's] actual malice." *Id.* at 618, 643 *A.*2d 1012 (citation omitted).

## IV.

In sum, we conclude that the alleged defamatory material was entitled to substantial First Amendment protection because it involved a matter of public concern—the welfare of children entrusted to the care of a teacher. On issues of public concern, heightened standards of free speech require that a plaintiff allege and prove pecuniary or reputational harm. Here, plaintiff failed to do so. Because defamation laws were created to balance the interests of reputation and free speech, plaintiff's failure to allege any reputational or pecuniary harm precludes her defamation claim.

We decide this case on our conclusion that the content of defendant's letter implicated the public interest and that plaintiff's proofs fell short of the actual-malice standard. We reserve for a future case the question whether the doctrine of presumed damages should apply to claims made by a private-figure plaintiff when no public interest is implicated. Similarly, in view of our conclusion that society's interest in the content of the letter mandated that plaintiff proffer proof of reputational or pecuniary harm, we do not need to decide whether the letter represented a privileged communication.

As modified, the judgment of the Appellate Division is affirmed.

O'HERN, J., dissenting.

As the late William Prosser observed many years ago, "There is a great deal about the law of defamation which makes no sense." Matters are even worse today. According to the authors of a leading casebook, "[t]he current state of libel law has been deplored by almost everyone affected by it." Plaintiffs are dissatisfied, in large part because their success rate is extremely low, while defendants are frustrated because they cannot prevail earlier in the litigation and thus, incur substantial litigation costs.... [M]any, if not most, of the problems in modern defamation law can be traced to its constitutionalization by the Supreme Court ...

[Cynthia Nance, *The Uniform Correction or Clarification of Defamation Act: How Not to Reform Arkansas Defamation Law*, 51 *Ark. L.Rev.* 721 (1998).]

In this case, which "makes no sense" to me, I dissent primarily for the reasons stated by Judge Lesemann in the Appellate Division. 323 *N.J.Super.* 18, 26, 731 *A.*2d 1205 (App.Div.1999).

The only issue before us is the viability of the doctrine of "presumed damages." In *Ward v. Zelikovsky,* 263 *N.J.Super.* 497, 623 *A.*2d 285 (App.Div.1993), Judge Antell traced the history of the requirement of special damages in slander actions to the ancient divisions between ecclesiastical courts and the King's courts. Ecclesiastical courts had jurisdiction over spiritual matters and the King's Court over temporal matters. Defamation without temporal losses was a sin to be punished in the church courts.

The requirement of special damages was an accident of history designed to resolve a jurisdictional conflict. Justice Holmes once noted that "whenever we trace a leading doctrine of substantive law far enough back, we are very likely to find some forgotten circumstance of procedure at its source." Oliver W. Holmes, Jr. *The Common Law* 253 (1991).

Presumed damages were simply a procedural device to get out of the church courts. It is one thing to state that damages for defamation may not be presumed in cases of public concern without a showing of actual malice. It is quite another thing to say that one does not suffer damages from defamation unless pecuniary or special loss may be proven. In *Milkovich v. Lorain Journal Co.,* 497 *U.S.* 1, 10, 110 *S.Ct.* 2695, 2701, 111 *L.Ed.*2d 1 (1990), Chief Justice Rehnquist quoted the familiar lines from Shakespeare's *Othello:*

> Good name in man and woman, dear my lord, Is the immediate jewel of their souls. Who steals my purse steals trash; 'Tis something, nothing; 'Twas mine, 'tis his, and has been slave to thousands; But he that filches from me my good name Robs me of that which not enriches him, And makes me poor indeed.

Defamation law developed as a means of allowing an individual to vindicate her good name, and *also* for the purpose of obtaining redress for harm caused by such statements. *Ibid.* (citing L. Eldredge *Law of Defamation* 5 (1978) (emphasis added)). "Preventing and redressing attacks upon reputation" is one of the "important social values" underlying the law of defamation. *Rosenblatt v. Baer,* 383 *U.S.* 75, 86, 86 *S.Ct.* 669, 676, 15 *L.Ed.*2d 597, 605 (1966).

Under New Jersey law, four kinds of statements qualify as slander *per se* that is defamation that in and of itself injures the person: accusing another (1) of having committed a criminal offense, (2) of having a loathsome disease, (3) of engaging in conduct or having a condition or trait incompatible with his or her business, or (4) of having engaged in serious sexual misconduct. *Biondi v. Nassimos*, 300 *N.J.Super.* 148, 154, 692 *A.*2d 103 (App. Div.1997).

In this case, in which defendant's allegedly defamatory statements were written instead of oral, the Court holds that plaintiff must produce evidence of special damage to her reputation. This requirement of "temporal losses" (rooted as it was in antipathy to ecclesiastical courts) serves no legitimate purpose today. Are we really to expect that a defamed teacher must produce witnesses who will testify that they believed the false and malicious gossip spread about her by a teacher who went on the school trip with her? Would a judge who was falsely libeled as having been drunk on the bench have to produce lawyers or judges to say that "yes, indeed we did believe that the judge was an inebriate"? I should think not.

At common law, a libel plaintiff who established that he was the subject of a published defamatory statement was presumed, without the necessity of specific trial proof, to have been damaged. In *Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 349, 94 *S.Ct.* 2997, 3011, 41 *L.Ed.*2d 789, 810–11 (1974). Justice Powell, writing for the majority and disapproving of the doctrine of presumed damages, commented:

> The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred.

Without the limiting restraint of trial proof, juries were able to punish unpopular opinion or unpopular defendants. Repudiating the common law libel doctrine of presumed damages, the Court

held: "For the reasons stated below, we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Gertz, supra,* 418 *U.S.* at 349, 94 *S.Ct.* at 3011, 41 *L.Ed.*2d at 810.[1]

The converse proposition, of course, is that, if actual malice is established, plaintiff is entitled to recover presumed damages without proof of loss of reputation or damages.

When in *Sisler v. Gannett Co.,* 104 *N.J.* 256, 516 *A.*2d 1083 (1986), we required a showing of actual malice in order to recover presumed damages in matters implicating the public concern, we did not intend the converse—that consequential special or economic damages were required as a condition to the recovery of damages to reputation. *Gertz* simply held, as a matter of federal constitutional law, that all such libel plaintiffs must prove actual injury and damage. *Gertz* itself explained:

Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

[*Gertz, supra,* 418 *U.S.* at 350, 94 *S.Ct.* at 3012, 41 *L.Ed.*2d at 811.]

*Canino v. New York News, Inc.,* 96 *N.J.* 189, 475 *A.*2d 528,(1984) held that a defamation action survives death under the Survival Act. We reasoned that the earlier New Jersey courts had held that "libel or slander, an injury to the person, *quite apart from economic loss, was a trespass or, as it was known then and now, a tort."* *Id.* at 195, 475 *A.*2d 528 (emphasis added). At

---

1 In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 *U.S.* 749, 761, 105 *S.Ct.* 2939, 2946, 86 *L.Ed.*2d 593, 603–04 (1985), the Court held that the *Gertz* restrictions on the availability of presumed damages do not apply to all speech. Because there is a "reduced constitutional value [in] speech involving no matters of public concern," presumed and punitive damages may be awarded "even absent a showing of 'actual malice.' "

common law, for an injury to the person, such as an assault or battery, one need not establish economic damages—only the hurt itself.

Had this been an action in slander (that is, for oral defamation), a statement that adversely reflected on the plaintiff's fitness as a teacher (what is worse than a drunken teacher?) would fall within the categories of slander *per se* that do not require a showing of special damages. Such damages, referred to as "general damages" in the context of defamation law, are to be distinguished from an award of mere nominal damages. They may, upon a showing of slander *per se,* be awarded without any proof going to damages upon the theory that the jury, by its own understanding, is competent to calculate approximate compensation for the injury to the plaintiff's feelings and reputation that would naturally flow from the publication of such derogatory remarks. Charles T. McCormick, *Handbook on the Law of Damages* 116 (1935) (*citing Doherty v. L.B. Price Mercantile Co.,* 132 39, 132 *Miss.* 39, 95 *So.* 790, 790–91 (1923); *Hubbard v. Rutledge,* 52 *Miss.* 581 (1876)). General damages in defamation law constitute those losses that are normally, usually, and foreseeably caused by the harm to the plaintiff's reputation. General damages may encompass not only monetary harm, but also those losses that are not readily subject to economic calculation, such as losses to one's enjoyment of life, damage to one's dignity, and damage to one's relationships with others. *Restatement (Second) of Torts* § 621 cmt. a. In *Dun & Bradstreet,* the Supreme Court recognized that the rationale for the common-law rules was the experience and judgment of history that "proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication it is all but certain that serious harm has resulted in fact." 472 *U.S.* at 760, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 603 (citing W. Prosser, *Law of Torts* § 112, p. 765 (4th ed.1971)).

It would be a paradox that a written statement that subjected a teacher to "social opprobrium" (which case law defines as "public

condemnation, hatred, contempt, ridicule or disgrace" *Kimmerle v. New York Evening Journal, Inc.,* 262 *N.Y.* 99, 102, 186 *N.E.* 217 (1933)) would not be actionable when an oral statement would be actionable.

I am all for doing away with the jargon of defamation law— "libel *per se,*" "libel *per quod,*" and so forth. I am all for retaining the common sense judgment of history that a jury, in its own understanding, is competent to calculate an appropriate award for damage to reputation. Defamation is a dignitary tort that injures the person. Damages need not be presumed, but juries may be instructed that they may find that a person has been injured when subjected to social opprobrium such that her fitness to practice a profession has been falsely impugned. Ana Rocci acknowledges that her case involves a matter of public concern. She alleges that she can establish that defendants published the libel against her with actual malice, that is with reckless disregard for its truth. She should be permitted to present her case to a jury without having to prove special damages other than the damage to her good name.

Finally, I need comment but briefly on the Court's reliance on *Costello v. Ocean County Observer,* 136 *N.J.* 594, 643 *A.2d* 1012 (1994). Relying on *Costello* (a case that involved the non-liability of busy reporter trying to decipher public documents as a deadline approached not a gossipy fellow-teacher), the Court further justifies its dismissal on the basis that plaintiff had insufficiently pleaded or proved the actual malice (reckless disregard for truth) required by *Sisler, supra,* and *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.2d* 686 (1964), in matters of public concern. That point was never raised at any time in these proceedings. The only points raised in defendant's Supreme Court briefs were that plaintiff had failed to establish the requisite defamation element of damages, that the Court should eliminate the doctrine of presumed damages and that plaintiff had failed to establish "actual reputational injury, either pecuniary or non-pecuniary."

I would have thought that the time had long since passed when litigants would be deprived of a day in Court on the basis of a theory of law neither pleaded nor advanced by a party. In *Vacca v. Stika*, Chief Justice Vanderbilt, a principal architect of our judicial system, explained the goals of our jurisprudence:

> The philosophy underlying our present system of procedure is not something to be recognized in the abstract, to be much discussed but less often followed and applied. The evils of delay, technicalities and multiplicity of action in order to obtain complete relief in the courts were the critical elements that led to the reform movement in this State, of which the adoption of our Constitution of 1947 and new rules of procedure were only the beginning. The important lesson we all had to learn was that we must always keep foremost in our minds the need of a progressive system for the administration of justice if we are not gradually to relapse into the old ways of delay, technicalities and *surprise*. To prevent this ... is the day-to-day obligation of the bench and bar.
>
> [21 *N.J.* 471, 475, 122 *A.*2d 619 (1956) (emphasis added).]

Consistent with that philosophy, the Court has always recognized that "justice is the polestar [of our judicial system] and our procedures must be moulded and applied with that in mind," *New Jersey Highway Auth. v. Renner*, 18 *N.J.* 485, 495, 114 *A.*2d 555, (1955), and we have consistently held that "the paramount policies of our law require that ... the plaintiff be afforded an opportunity to have the claim adjudicated on the merits." *Crispin v. Volkswagenwerk, A.G.*, 96 *N.J.* 336, 338, 476 *A.*2d 250 (1984). I would do that here. Rather than to surprise plaintiff with a theory that she has never had the chance to meet, I would let her have her day in court.

*As modified and affirmed*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—6.

*For reversal*—Justice O'HERN—1.