IN THE MATTER OF SYLVESTER SERVANCE, AN
ATTORNEY AT LAW.

May 9, 1986.

## ORDER

SYLVESTER SERVANCE, of VOORHEES, who was admitted to the Bar of this State in 1977, having been ordered by this Court to show cause why he should not be disbarred or otherwise disciplined for conduct involving misrepresentation and fraud, in violation of *DR* 1–102(A)(4), and conduct adversely reflecting on his fitness to practice law, in violation of *DR* 1–102(A)(6), and respondent having made no appearance before this Court, and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and respondent is disbarred; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, be added as a permanent part of the file of said SYLVESTER SERVANCE as an attorney at law of the State of New Jersey; and it is further

ORDERED that SYLVESTER SERVANCE be and hereby is restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys; and it is further

ORDERED that SYLVESTER SERVANCE reimburse the Ethics Financial Committee for appropriate administrative costs.

*Decision and Recommendation of the*
*Disciplinary Review Board*

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board based upon two presentments filed by the District IV (Camden County) Ethics Committee recommending public discipline. The Board makes the following findings of fact:

1. *Carol Wright Matter*

Carol Wright of Philadelphia met Respondent in March 1982 after being referred to him through a friend of hers who had made successful financial investments with him. Wright was looking for someone to advise her legally and financially. Respondent, a member of the bar of this state, was an insurance agent in Philadelphia. He resided in this state and had printed stationery indicating he was an attorney at law and was in

partnership with another attorney with an office at 2102 Laurel Road, Lindenwold. The *1982 New Jersey Lawyers Diary* indicated that his law office was located in Paterson, which, in fact, was his mother's address.

Although Wright's testimony was not wholly consistent with the evidence produced at the Ethics Committee hearing, the Board finds as a fact that she first gave Respondent money on March 11, 1982 and not February 11, 1982 as she had testified at that hearing. On March 11, 1982 she went to Respondent's office and was introduced by Respondent to a William Smith who was investing in land to build a casino in Atlantic City. She gave Respondent $3,000 in cash. In return, Respondent gave her a promissory note which stated that he received the money for Smith and would pay her $6,000 before February 11, 1984.*

On March 23, 1982 she gave Respondent $7,000 in cash and on the following day, $10,000 in cash. On his attorney stationery, Respondent gave her promissory notes that he would pay her $14,000 before April 23, 1982 and $20,000 before April 24, 1982. In both notes, he personally guaranteed the initial investment amount to her. Wright gave Respondent this money to invest in oil deals. He assured her that he was knowledgable in this field and had made similar investments for others. She trusted Respondent with her money because he was an attorney and because of his stated experience in oil investments. She later had difficulty contacting him to learn the status of her investment. Having left her job, she depended on the doubling of her investment to enroll in college. When she questioned him as to what he did with her money, she maintained Respondent stalled her. He stated that he was attending frequent meetings in New York concerning this investment and that the investments would take time.

---

*This document was marked into evidence at the Ethics Committee hearing as CW–5. The court reporter noted for the record that it was dated March 11, 1982. See Ethics Committee transcript dated January 8, 1985, 1T23—21 to 22.

## 2. *Keith Fountain Matter*

Keith Fountain of Philadelphia was introduced to Respondent by Wright. Respondent told Fountain that he could advise him in certain areas as investment counsel. Since Respondent was an attorney, Fountain had confidence in him. Fountain gave Respondent $8,000 on March 24, 1982 for oil investments. Respondent on his attorney stationery, gave Fountain a promissory note to pay $16,000 before April 24, 1982. Respondent personally guaranteed the initial investment to Fountain. The record is silent as to the facts surrounding another promissory note which Respondent gave Fountain on October 8, 1982 whereby Respondent agreed to "assign all future earning" [sic] up to $50,000 beginning November 1, 1982. Fountain did not receive the expected return from his investment. He, too, had great difficulty contacting Respondent. At various times, Fountain and Wright together received a total of about $2,900 from Respondent which they shared. This was the only return they received from their investments.

On November 4, 1982 Wright and Fountain filed a civil complaint against Respondent in which Wright sought $17,000 and Fountain, $8,000. On March 29, 1983 a default order was entered against Respondent for failing to file a timely answer to the complaint. Wright and Fountain complained to the Ethics Committee about Respondent by letter dated January 17, 1983 and a formal Ethics complaint was issued December 9, 1983.

## 3. *Gary Murray Matter*

Gary Murray of Philadelphia was referred to Respondent by his cousin, a minister. Murray's mother had died recently. Respondent informed Murray, his brothers and sister that he was a corporate attorney and would assist them in processing the necessary papers for their late mother's estate. On Respondent's office desk was a sign identifying him as an attorney. Murray, did not know that Respondent was in the insur-

ance business. At that meeting, Respondent suggested they invest their inheritance in oil and in a medical service firm.

In May 1981, Murray gave Respondent $6,000 in cash to invest in a medical service company. Respondent, accompanied by the company president and vice-president, received this money in Murray's home. Respondent gave the cash to the company president. Murray was to receive one-third of one percent interest in that company. He never received any company stock. In December 1981, Respondent received $4,000 from him and in March 1982, $2,000, for a total of $12,000. Respondent gave Murray a promissory note dated March 9, 1982 whereby Respondent agreed to pay $6,000 before May 30, 1982. This promissory note was on Respondent's legal stationery. Murray gave Respondent the money to invest because he felt that Respondent had special expertise in that area. He relied on his statements because Respondent was an attorney. He testified that he would not have invested with Respondent if Respondent had not been an attorney.

On July 30, 1982 Murray received a check from Respondent for $25,000 which was designated a "loan repayment." However, this check was not honored by the bank. When Respondent gave this check to Murray, Respondent stated that this was the first return that Murray would receive and was the lowest that he could expect to receive. Murray thereafter was not able to contact Respondent.

According to Respondent, he informed Murray and his siblings that he was not licensed to practice law in Pennsylvania. Their mother's estate consisted of a house and insurance proceeds; the house was in name of Murray's sister. He explained that Murray was not able to reach him at his New Jersey telephone number because his phone had been disconnected for nonpayment.

At the District Ethics Committee hearings, Respondent maintained that he met a woman whom he identified as Brenda Williams at a reception in Washington, D.C. She was a consult-

ant in foreign oil transactions. He also met a man involved in oil transactions who stated that he was involved with buying and selling oil. They needed working capital and agreed to repay the investors twice the amount of their investments within a one month period. Respondent maintained that he would not have taken the money if he had known that the transactions were not ongoing, or if he thought they were not feasible. Respondent claimed that he told the investors that he was willing to stand behind the investments himself. He was told that the parties were ready to close on a deal and needed working capital to carry it through. Respondent further claimed that he was promised by Brenda Williams that the money would be wired directly into his bank account. He told Murray that the funds should be there by a certain date, but they never were received.

At the Board hearing, Respondent elaborated by stating that he was supposed to receive one half million dollars from Williams. Concerning the $25,000 check to Murray, Respondent maintained that he was giving Murray a gift of $19,000 because he assumed Murray had lost $6,000 of his investment. Respondent maintained that he had not provided legal services for any of the parties involved in this matter. The $25,000 check was drawn against Respondent's attorney account in this state.

Concerning the Wright and Fountain complaints, the District Ethics Committee concluded that Respondent was guilty of violating *DR* 1–102(A)(3) and (6). It held that an attorney who held himself out as an investment counselor had a high obligation, especially when the clients relied on him because he was an attorney. Concerning the Murray complaint, the Committee found that Respondent violated *DR* 1–102(A)(3), (4) and (6) in that Respondent's conduct adversely reflected upon his fitness to practice law, that he engaged in conduct involving dishonesty, fraud or misrepresentation, and that he engaged in other conduct which adversely reflected upon his fitness to practice law.

Respondent was temporarily suspended from the practice of law on August 29, 1983 by the Supreme Court. That suspension remains in effect. See 94 *N.J.* 623 (1983).

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Ethics Committee in finding unethical conduct on the part of Respondent are fully supported by clear and convincing evidence.

Respondent accepted substantial sums of money from clients for investment in what can only be described as a "get rich quick" scheme. Respondent would accept cash from. clients with the promise that the investment would double in about a month's time. In the three matters before this Board, the clients failed to receive their expected profit. Respondent failed to communicate with them when they inquired about the status of their investments. Respondent maintained that his full time occupation was that of an insurance agent and that he did not practice law either in Pennsylvania or New Jersey. However, each of the three complainants trusted Respondent with their money because Respondent was an attorney and not because he was an insurance agent.

Respondent said that he became involved in foreign oil investments after he met Brenda Williams. At no time did Respondent, who has a Bachelor of Science in mathematics with a minor in Business Administration, an MBA in finance and a law degree, either investigate her or the particular financial investment deal that she offered. He transacted business with her on a cash basis in either a hotel in Washington, D.C. or in New York. He maintained that the borrowers needed immediate capital to close their oil transactions and were willing to pay twice the amount loaned them. Respondent claimed that he invested some of his own money. He stated that the $25,000 check he had given to Murray was returned for insufficient funds because Williams had not deposited half a million dollars

in his bank account as promised. He said this money was to pay off the investors. He maintained before the Board that he had not taken in that amount from various people, but again he did not elaborate. He also stated before the Board that he was to receive an additional half a million dollars from Brenda Williams for his involvement.

The Board cannot conclude by clear and convincing evidence that these investments were part of a fraudulent scheme because the record touches the surface of this operation only slightly. However, "any reasonable person's suspicion would have been raised by ... [the] purported investment" opportunity which promised "an exceptionally high rate of profit ..." *Application of Matthews*, 94 *N.J.* 59, 79 (1983). There were no written contracts regarding these investments except for Respondent's promissory notes which guaranteed the return of the initial amounts of the investments. All transactions were in cash, again leaving no trail of with whom and what actually transpired. Respondent had no background information on these investments or the principals offering them. Despite this lack of information regarding these investments, Respondent unequivocally stated to his clients that he felt these were sound investments which he would personally guarantee. At the Ethics Committee hearing, Respondent stated that he had not been able to contact those involved in the investments. The Board finds Respondent's expressed naivete to be incredible.

The Board concludes that Respondent's conduct "fell far short of the high standards expected of him." *In re Ryan*, 66 *N.J.* 147, 150 (1974). While there was no attorney-client relationship, each complainant knew Respondent was an attorney and trusted him to act in that client's best interest. In each case, Respondent gave the complainant a promissory note on his attorney stationery reinforcing in the complainant's mind that Respondent was acting as an attorney. The $25,000 check which Respondent gave to Murray was drawn against his attorney account in this state. "An attorney does not discard his professional standing and obligation to maintain a high

standard of conduct when he engages in a business transaction" *Ibid.* See also *In re Carlsen,* 17 *N.J.* 338, 346 (1955). This remains the benchmark of the legal profession even though the commercial market place may accept a lower standard. See *In re Franklin,* 71 *N.J.* 425, 429 (1976) and *In re Suchanoff,* 93 *N.J.* 226, 230–231 (1983). The Court in *Ryan, supra,* noted that it had stated in *In re Boyle,* 18 *N.J.* 415, 416 (1955) that

> [b]ecause of the education and training of the legal profession and the opportunities inherent in their practice, they very clearly have a duty and a challenge to exert a wholesome influence by fostering high ideals [*In re Ryan* 66 N.J. at 150].

A client will entrust an attorney with his funds because he trusts the attorney. "It is a trust built on centuries of honesty and faithfulness." *In re Wilson,* 81 *N.J.* 451, 455 (1979). This trust must be preserved. *Id.* at 456.

The Board finds that Respondent's actions involved misrepresentation and fraud. He represented to his clients that he was aware of the nature and soundness of the investments when, in fact, he knew little or nothing about them. DR 1–102(A)(4) His conduct adversely reflected on his fitness to practice law. *DR* 1–102(A)(6) He not only injured his clients but also the reputation of every member of the bar of this state.

Appropriate attorney discipline is "to protect the public from the attorney who does not and cannot meet the standards of responsibility of every member of the profession." *Matter of Templeton,* 99 *N.J.* 365, 374 (1985); *In re Goldstaub,* 90 *N.J.* 1, 5 (1982). "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re Nigohosian,* 88 *N.J.* 308, 315 (1982).

The Board concludes that Respondent's "conduct reflects a lack of awareness of the degree of professionalism expected of every member of the Bar." *In re Katz,* 90 *N.J.* 272, 284 (1982). The Board finds as significant aggravating factors the injury caused to Respondent's clients and to the profession. His

clients have never been reimbursed. The Board finds no mitigating factors. The participating members of the Board recommend unanimously that Respondent be disbarred based on the totality of his conduct. One member did not participate.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.