775 A.2d 678 (2001)
342 N.J. Super. 1
Sally Starr GRAY, a/k/a Sally Starr, Plaintiff-Appellant,
v.
PRESS COMMUNICATIONS, LLC, and Jeff Diminski and Leigh Jacobs, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted April 25, 2001.
Decided July 2, 2001.
*680 Sagan & Greenberg, attorneys for appellant (B. Adam Sagan, of counsel; Jeffrey Zajac, on the brief).
McCarter & English, Newark, attorneys for respondents (Richard M. Eittreim, of counsel; Katie A. Gummer and Eric D. Sherman, on the brief).
Before Judges KEEFE, EICHEN and STEINBERG.
*679 The opinion of the court was delivered by STEINBERG, J.A.D.
Plaintiff Sally Starr Gray appeals from an order granting summary judgment in favor of defendants Press Communications, L.L.C., Jeff Diminski, and Leigh Jacobs. The order resulted in the dismissal of the complaint for defamation that she had filed against them. We reverse.
In support of their motion for summary judgment, defendants filed a biographical profile of plaintiff. According to that profile, plaintiff began her entertainment career, in radio, in the 1940's. She served as the regional voice of the Pepsi Cola Company doing all of its commercial spots. Eventually, she commenced performing on radio full-time. In 1950, she commenced hosting a children's television program in Philadelphia. The show lasted through 1972, and featured cartoons, live acts, as well as personal appearances from Roy Rogers, Dale Evans, Dick Clark, Jerry Lewis, Tim Conway, Jimmy Durante, Nick Adams, the Three Stooges, and others. At her deposition, she said she also completed one personal appearance per day, and up to three such performances on Saturdays. In addition, she said at her deposition that in the early 1980's, she re-entered the personal appearance market, after she had moved back to the Delaware Valley area from Florida, and began to *681 make appearances on behalf of businesses and charities. Moreover, she said she participated in various community organizations. For example, she was on the Board of Directors of what she referred to as a "No Kill Animal Shelter" as well as the Alzheimer's Foundation. She also said she did appearances for the Children's Miracle Network, Manna, which was described as an organization that served meals at home to people suffering from AIDS. She also did personal appearances for the AIDS Foundation. Additionally, she has appeared on behalf of many charitable organizations.
She also stated that she appeared in the Philadelphia Gay Pride Parade, where her participation was limited to riding on the back of a convertible and waving to people. Additionally, she made several paid appearances at an outdoor festival in Philadelphia, held in connection with the Gay Pride festivities.
At the time of the incident that gave rise to this litigation, defendant Jeff Diminski was the co-host of an afternoon, call-in radio program, on FM 101.5, a New Jersey radio station. Press Communication, LLC, was the licensee of 101.5. Jacobs was the program director.
At his deposition, Diminski said the program was "largely, while topical and newsie, very entertainment driven." He defined entertainment driven as "[n]on-political, not so much serious debate of issues, non-public affairs, more humor-based." He and his co-host, Bill Doyle, operated under guidelines, provided by the station, to appeal to an audience between the ages of twenty-five to fifty-four, and focused their discussion on
things that were going on in New Jersey, both out of the news, as well as just life-style things like parking disputes at a New Jersey mall during Black Friday, the day after Thanksgiving. And to do it with an eye toward a younger audience, meaning something fresh, something funny, little edgy, but certainly within certain guidelines. As far as taboo, we were sort of told, a dead end street was never to talk about gun control or abortion and it's getting much more public affairs kind of thing.
On July 24, 1998, the show was centered on children's television programs and callers were asked to discuss their childhood, or name their children's favorite shows. The transcript of the relevant portions of the program that gave rise to this lawsuit, which was furnished to the motion judge, reveals that a person named Sally called in to give the name of her two favorite shows, and the following exchange occurred:
SALLY: Two shows, Sally Starr Show.
DIMINSKI: That was the lesbian cowgirl I think.
SALLY: Yeah.
DOYLE: Yeah. And what. What?
DIMINSKI: The lesbian cowgirl, Sally Starr.
SALLY: Oh, you're sick. The next show is the Jean London Show. I am not calling anymore. That was really gross. Goodbye.
DIMINSKI: Okay. Sorry.
At his deposition, which was also supplied to the motion judge, Diminski explained the basis for, and the reasoning, behind his comment. He said that since he had been raised in North Jersey, he had never heard of Sally Starr until sometime in the 1980's, when he and his wife's family who were from Philadelphia were "kind of sitting around talking about old things in Philly which of course I wasn't privy to." He had never seen her show and it was explained to him that she was a "cowgirl television show host."
Diminski then mentioned three occasions in which he had heard that plaintiff *682 was a self-identified lesbian. He said that on one occasion "the next door neighbor and friends or something," of his in-laws, mentioned that they had heard on the local news that "Sally Starr had been involved with the Gay Pride parade and how Sally Starr had been a so-called out lesbian." He also remembered one occasion "probably in 1995 or something like that" while he was working on his car when he "heard this conversation. I remembered back to the other conversation from the 80's about who Sally Starr was." Finally, he mentioned an occasion, "probably around 1988 or 1989" at "some club" where he was performing as a stand-up comedian, and some of the comedians were having a conversation about plaintiff, and "it wasn't said in a joking way or even in a demeaning way but just about how she had in later life, I hate to use the term came out of the closet and had acknowledged that she was a lesbian." He said he "just had heard various things like that to the point where I thought it was just sort of common knowledge for people who were in that area, who were in the Delaware Valley or had grown up watching her. But I for one did not even know what the woman looked like."
Defendant was unable to identify any of the individuals in these conversations. He also said to the best of his recollection, he never read an interview with plaintiff where she identified herself as a lesbian.
Plaintiff learned of the comment from friends who listened to the show. She called the radio station immediately, and apparently reached Diminski's call screener, but "couldn't get any where with him." She asked to speak to Jacobs, the program director. She complained that Diminski had referred to her as a "lesbian cowgirl." Jacobs said that he did not hear the comment, but would "go into the studio and correct it." Diminski retracted the statement, noting "[i]t has been very informative today. We have learned about sex offenders' rights. We learned about diamonds. We learned Sally Starr is not a lesbian."

* * *
DIMINSKI: So here is what's really funny is our boss gets a phone call. Now our boss didn't hear us talking about this. All he knows all of a sudden Sally Starr is on the phone with our boss screaming about me calling her a lesbian.
DOYLE: Sally Starr is somebody he watched as a kid. So it was a very interesting episode.
DIMINSKI: Right. But it was very bizarre and surreal for him so I just wanted to say that apparently she is not and I apologize for that because I know that I wouldn't want to be called a lesbian so she is not a lesbian. It is six o'clock.
At the hearing on defendants' motion for summary judgment, the judge preliminarily stated that "plaintiff is a public figure." Plaintiff's attorney apparently acquiesced in that comment and indeed on this appeal does not suggest otherwise.[1] The judge concluded that in order to prevail, plaintiff must demonstrate, by clear and convincing evidence, that defendant's statement was accompanied by malice, that it was made with "knowledge of the probable falsity of the statement." The judge concluded that the materials furnished him did not establish "anything close to clear *683 and convincing evidence" that Diminski either acted with malice, or in reckless disregard of the truth.
On this appeal, plaintiff argues that the motion judge erred in granting summary judgment because: (1) the term "lesbian cowgirl" is reasonably susceptible of a defamatory meaning, and (2) summary judgment should have been denied since a reasonable factfinder could find by clear and convincing evidence that Diminski uttered his comment "knowing that it was false or seriously doubting its truth."
It is well-settled that in deciding whether to grant summary judgment, the motion judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of as any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). The judge's function is to determine whether there is a genuine issue for trial, but not to weigh the evidence or decide the issue. Brill, supra, 142 N.J. at 540, 666 A.2d 146. An alleged disputed issue of fact is not considered genuine if there exists a single unavoidable resolution of that issue. Ibid. Stated another way, "if the evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." Ibid. (internal citation omitted). An appellate court applies the same standard that governs trial courts in determining whether summary judgment was properly granted. Graziano v. Grant, 326 N.J.Super. 328, 338, 741 A.2d 156 (App.Div.1999).
In a defamation action, the threshold issue is whether the language used is reasonably susceptible of a defamatory meaning. Decker v. Princeton Packet, 116 N.J. 418, 424, 561 A.2d 1122 (1989); Romaine v. Kallinger, 109 N.J. 282, 290-91, 537 A.2d 284 (1988); Kotlikoff v. The Community News, 89 N.J. 62, 67, 444 A.2d 1086 (1982). Initially, the question is one of law to be decided by the court. Decker, supra, 116 N.J. at 424, 561 A.2d 1122; Kotlikoff, supra, 89 N.J. at 67, 444 A.2d 1086. If the statement is susceptible of only one meaning, and that meaning is defamatory, the statement is defamatory as a matter of law. Romaine, supra, 109 N.J. at 290, 537 A.2d 284. On the other hand, if the statement is susceptible of only a non-defamatory meaning, it cannot be considered defamatory, and the complaint must be dismissed. Ibid. However, in those cases where the statement is capable of being assigned more than one meaning, one of which is defamatory and another not, the question of whether its content is defamatory is one that must be resolved by the factfinder. Id. at 290-91, 508 A.2d 178.
Our research has failed to disclose a case in New Jersey considering whether an accusation of homosexuality is defamatory. However, the majority of jurisdictions in other states that have considered the issue have concluded that a false accusation of homosexuality is actionable. See, for example, Bohdan v. Alltool Mfg. Co., 411 N.W.2d 902, 907 (Minn.App.1987) *684 (false accusation that plaintiff's sexual preference was other than heterosexual is at least reasonably susceptible of a defamatory meaning); Nazeri v. Missouri Valley College, 860 S.W.2d 303, 312 (Mo.Sup. Ct.1993), rehearing denied, September 28, 1998 (allegation of homosexuality is defamatory per se); Thomas v. Bet Sound-Stage Restaurant/BrettCo, Inc., 61 F.Supp.2d, 448 (D.Md.1999) (false statements regarding plaintiff's sexual preference are defamatory); Moricoli v. Schwartz, 46 Ill.App.3d 481, 5 Ill.Dec. 74, 361 N.E.2d 74, 76 (1977) (accusation of homosexuality is actionable but not libelous per se and requires proof of special damages); Hayes v. Smith, 832 P.2d 1022 (Colo.App.1991) (same); Head v. Newton, 596 S.W.2d. 209, 210 (Tex.Civ. App.1980) (false accusation or homosexuality is slanderous per se). Although society has come a long way in recognizing a persons' right to freely exercise his or her sexual preferences, unfortunately, the fact remains that a number of citizens still look upon homosexuality with disfavor. Accordingly, we conclude that at the very least, a false accusation of homosexuality is reasonably susceptible to a defamation meaning.
In order to prove defamation, a plaintiff must establish that defendant made a defamatory statement of fact concerning plaintiff, which was false, and was communicated to a person or persons other than plaintiff. Govito v. West Jersey Health System, 332 N.J.Super. 293, 305, 753 A.2d 716 (App.Div.2000). A defamatory statement is one that tends to harm the reputation of the plaintiff or to lower plaintiff in the estimation of the community or deter third persons from associating or dealing with him or her. Ibid. Moreover, a plaintiff must establish damages. Ibid.
As previously noted, plaintiff conceded she was a public figure. Because of the strong interests in uninhibited debate on public issues, our courts have held that the First Amendment protects statements made concerning public officials, or public figures, unless those statements are made with knowledge that they were false or with reckless disregard of whether they were false or not. New York Times v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct., 710, 726, 11 L.Ed.2d 686, 706 (1964); Curtis Publishing Co. v. Butts, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094, 1116 (1967); Sisler v. Gannett Co., Inc., 104 N.J. 256, 263, 516 A.2d 1083 (1986).
"To satisfy the actual-malice standard, a plaintiff must show by clear and convincing evidence that the publisher either knew that the statement was false or published with reckless disregard for the truth." Lynch v. New Jersey Educ. Ass'n., 161 N.J. 152, 165, 735 A.2d 1129 (1999) (internal citations omitted). To prove that the publication was made with reckless disregard for the truth, "a plaintiff must show that the publisher made the statement with a `high degree of awareness of [its] probable falsity,' or with `serious doubts' as to the truth of the publication." Ibid. (internal citations omitted). While negligent publication does not satisfy the actual-malice test, a finding of reckless publication may result if the publisher either fabricates a story, or publishes a story or accusation that is wholly unbelievable, or relies on an informant of dubious veracity, or purposely avoids the truth. Ibid. (internal citations omitted). While initially the question of malice must be determined by the court as question of law, summary judgment may only be granted if a reasonable factfinder could not find that plaintiff had established malice by clear and convincing evidence. Lynch, supra, 161 N.J. at 168-69, 735 A.2d 1129.
We recognize that litigation, particularly this type of litigation, is expensive, and, consequently, non-meritorious *685 defamation claims have a tendency to compromise or chill the exercise of First Amendment values. As a result, a court should not be reluctant to grant summary judgment if the defamation claim lacks merit. Rocci v. Ecole Secondaire Macdonald-Cartier, 165 N.J. 149, 158, 755 A.2d 583 (2000); Costello v. Ocean County Observer, 136 N.J. 594, 605, 643 A.2d 1012 (1994); Maressa v. New Jersey Monthly, 89 N.J. 176, 196, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982).
Acknowledging our responsibility to review the record and determine whether plaintiff introduced sufficient proof to establish that defendants abused their First Amendment privileges, and at the same time heed the admonition of the Supreme Court not to be reluctant to grant summary judgment in this type of case, we conclude that the judge erred in granting summary judgment. We recognize that in this type of case a plaintiff must produce substantial evidence to survive a motion for summary judgment. Costello, supra, 136 N.J. at 615, 643 A.2d 1012. We also recognize that while we are constrained to construe the evidence in the light most favorable to plaintiff, the clear and convincing standard in a defamation case adds an additional weight to plaintiff's burden. Ibid. On the other hand, ordinarily, where a party's state of mind is critical, and there is a genuine critical issue of material fact as to the state of mind, summary judgment should be denied since the issue of state of mind does not readily lend itself to summary disposition. Costello, supra, 136 N.J. at 615, 643 A.2d 1012; Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 291, 544 A.2d 377 (1988). Rarely will direct evidence be available to prove state of mind. Costello, supra, 136 N.J. at 615, 643 A.2d 1012. Hence, we are understandably reluctant to grant summary judgment if the issue of malice is present, provided that if when considered in the light most favorable to plaintiff, the reasonable inferences to be drawn from the evidence could lead a factfinder to conclude that defendant acted with malice, or, in reckless disregard of the truth. Ibid.
Here, we are satisfied that a reasonable factfinder could conclude by clear and convincing evidence, based upon the statement of Diminski, that he acted with reckless disregard of the truth in uttering this statement. To say the least, his sources were of dubious veracity. Indeed, they are so vague that a jury could find that they were contrived after the fact. In addition, a jury would reasonably conclude, in light of the vague nature of his recollection, that Diminski's statement that it was common knowledge that plaintiff is a lesbian, was not credible. Thus, we determine that the motion judge erred in granting summary judgment.
Presumably, because the motion judge found that plaintiff had failed to meet her burden with respect to establishing malice by clear and convincing evidence, he never reached defendants' additional contention that the comments were not defamatory in the first instance since they constituted parody, humor or a satire. Without expressing any opinion on the merits of defendants' contention, we decline to address the issue since it was not ruled upon in the first instance by the motion judge. Subcarrier Communications, Inc. v. Day, 299 N.J.Super. 634, 646, 691 A.2d 876 (App.Div.1997).
Our decision today should not deter responsible members of the print and electronic media from freely exercising their First Amendment privilege. Indeed, free and open debate, as well as dissemination of thought or opinions on public issues is one of the cornerstones of our democracy. The bar is understandably high for a plaintiff *686 to successfully assert this type of cause of action, and plaintiff must therefore meet a high threshold in order to defeat a motion for summary judgment. While the bar is properly set at a high level, it is not unattainable. If it were, there would be absolute immunity. We merely conclude that under the circumstances here presented a reasonable factfinder could conclude by clear and convincing evidence that Diminski acted with reckless disregard for the truth, and, consequently, the motion for summary judgment should have been denied.
Reversed and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] Based upon this concession, we have elected to decide this case as if plaintiff was a public figure. Indeed, we believe it would be inappropriate to do otherwise. However, we express no opinion whether plaintiff is, in fact, a public figure. See Sisler v. Gannett Co., Inc., 104 N.J. 256, 263, 516 A.2d 1083 (1986).