795 A.2d 914 (2002)
350 N.J. Super. 453
Ronald RICCIARDI and Acrison, Inc., Plaintiffs-Appellants,
v.
Mark WEBER and Swimmer & Weber, P.A., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 27, 2002.
Decided May 2, 2002.
*918 Robert A. Ritter, argued the cause for appellants (Schiffman, Berger, Abraham, Kaufman & Ritter, attorneys; Mr. Ritter and David J. Wallman, Hackensack, on the brief).
Michael D. Mezzacca, New Providence, argued the cause for respondents (Fitzpatrick, Reilly, Supple & Gaul, attorneys; Mr. Mezzacca, on the brief).
Before Judges BAIME, NEWMAN and FALL. *915 *916
*917 The opinion of the court was delivered by NEWMAN, J.A.D.
This is an appeal from an order dismissing plaintiffs' defamation action on summary judgment. Plaintiffs were the defendants in a prior lawsuit brought against them for hostile work environment sexual harassment. Defendants were the attorneys who represented the employee alleged to have been harassed. After that suit settled, plaintiffs brought this suit for defamation, alleging that, within days after the harassment lawsuit was filed, defendants made several defamatory statements to the press that went beyond the allegations contained in the complaint.
The trial judge granted defendants' motion for summary judgment, concluding that the statements defendants made were fair and accurate and had not been made with "actual malice." The judge also found that the statements did not constitute slander per se and that plaintiffs had failed to prove actual damages. While plaintiffs do not challenge that defendants were entitled to a qualified privilege, we conclude that plaintiffs provided enough evidence to withstand summary judgment on the actual malice issue. Plaintiffs also presented proofs that the defamatory statements constituted slander per se and actual damages to reputation were incurred. We, therefore, reverse and remand for trial.
Viewing the facts in a light most favorable to plaintiffs, they may be summarized as follows. In March 1998, Richard Brown filed suit against his former employer, plaintiff Acrison, and his former supervisor, plaintiff Ronald Ricciardi, in Superior Court, Law Division, Passaic County. Plaintiffs (defendants therein) were successful in removing the suit to federal court. The complaint alleged a hostile work environment based on both sexual and non-sexual harassment, violation of Brown's privacy, violation of the New Jersey Law Against Discrimination (LAD), and violation of Title VII of the Civil Rights Act.
Acrison was a New Jersey corporation located in Moonachie that manufactured dry bulk solids processing equipment. Ricciardi was vice president of Acrison. Brown began working for Acrison in 1974 and eventually worked his way up to the title of parts and production coordinator. Brown quit his job on November 7, 1996, after an incident with Ricciardi.
According to the original complaint filed in Brown v. Acrison, Brown alleged that, in 1992 or 1993, there began a campaign of sexual and non-sexual harassment against him. Brown alleged in his complaint that Ricciardi constantly asked Brown "if `he still got a hard on', how his sex life was, whether he got any sex from his wife and similar embarrassing and humiliating taunts and questions." The atmosphere in the workplace was permeated with inappropriate comments about Brown's marital relations.
In addition, Brown alleged in his original complaint that, after the elimination of the job of a fellow parts department worker, Brown was expected to do both jobs. According to Brown, he "was given no qualified help to handle and process the onslaught *919 of business, and ... was made to keep up with the rush of orders, being constantly hurried, harassed and being the target of verbal abuse." On November 7, 1996, Brown was verbally abused all day by Ricciardi in front of Brown's subordinates and other employees and, "having reached the limit of his endurance," Brown left his job.
Although Brown was initially denied unemployment compensation benefits, the Appeal Tribunal of the Department of Labor concluded, on December 26, 1996, that Brown was entitled to benefits because he had good cause for quitting. Specifically, the agency found that the employer had violated its obligation to use common courtesy in dealing with its workers and to preserve the dignity of its workers.
Brown's wife worked for defendant Mark Weber and his law firm as a legal secretary. Weber also knew Brown because Brown had done some renovation work in Weber's building. Weber had also represented both Brown and his wife in their suit to evict a tenant. In March 1998 Weber initiated the harassment suit on Brown's behalf.
Right before the suit was filed, the United States Supreme Court decided Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L. Ed.2d 201 (1998), a case involving male-on-male sexual harassment in the workplace. Brown's suit became instant news when it was filed, generating numerous newspaper articles and television reports. Weber's office fielded the calls from the media.
Weber alleged that he discussed the general allegations of the complaint with the news media and related substantially accurate information regarding the complaint. Although Brown was reluctant to be interviewed, he did agree to an interview in Weber's office in Hackensack by a reporter from The Record-Northern NJ. Brown claimed that Weber told him the interview would help his case. Brown assumed Weber meant that it would help get a quicker settlement. In addition to The Record article, articles appeared in other newspapers around the country summarizing the allegations of the complaint and quoting or paraphrasing Weber and Brown.
Pertinent to this appeal, the articles contained statements from Weber that: the Oncale case "made a good case better"; Ricciardi was "constantly smearing [Brown's] sexuality" and "constantly taunting [Brown] about sex"; Brown left the job because he could not stand the comments anymore; the unemployment compensation board determined that Brown left for good cause; Brown had asked Ricciardi several times to stop, but to no avail; Brown was "constantly harassed and berated, and it was all of a sexual nature"; and Brown was asking for one million dollars in compensatory damages plus punitive damages. The articles also contained statements that the suit alleged that the employer secretly hung mirrors over the toilet bowls at work. Weber also gave an interview to ABC News, in which he said that Ricciardi asked Brown about his daughter's sex life.
Weber claimed that all of the allegations contained in the complaint were related to him by Brown. In addition to interviewing Brown, Weber believed there was sufficient corroborating information for the complaint, including the length of Brown's employment with Acrison, Weber's personal relationship with Brown and his wife, and the unemployment compensation board's determination that Brown had left the job for good cause. Weber spoke to no one other than Brown and his wife before filing suit. Although he took notes of his interview with Brown, he could not produce them. Weber believed that, in the vast majority of cases, it was unnecessary *920 to gather information before a suit is filed, and that filing the complaint allows settlement discussions to begin as quickly as possible and involves the insurance carrier at the earliest stage of the proceedings.
According to Brown, when he spoke to Weber about filing suit, he mentioned that he had found a camera in the men's room ceiling tile at work. Brown told Weber to speak to another former employee, Mike Collins, about it. Brown told Weber not to put that allegation in the complaint, because he did not want to drag anybody else into his lawsuit. He also did not think he could prove the allegation. Although Weber later interviewed Collins, Collins claimed that his memory was not good and that he could not recall anything about cameras.
It was not disputed that the original complaint contained no reference to cameras or mirrors in the bathrooms. However, after the interview with the reporter from The Record, Weber did tell the reporter "off the record" about the camera. Although that allegation did not appear in The Record article, it did appear in articles in other newspapers. Brown found out that Weber had made statements to the media about cameras and mirrors being in the bathrooms. At some later point, after the newspaper articles had already appeared, the suit was amended to include this allegation.
With regard to questions about his daughter's sex life, Brown did not think that he ever told Weber that Ricciardi asked him directly about that. Rather, Brown told Weber that Ricciardi, in Brown's presence, had asked another worker, Thomas Niskach, who was the boyfriend of Brown's daughter, if his girlfriend gave him "head" last night.
Brown also denied ever telling Weber that he had asked Ricciardi to stop making these various comments, and denied discussing the amount of damages with Weber. He also told Weber that the incident on November 7, 1996, his last day of work, had nothing to do with any sexual comments, but that Ricciardi had screamed at him about a machine being broken.
Weber admitted that, in the late 1970's, an ethics complaint had been lodged against him by a former councilman who alleged that Weber made statements to the press involving a suit in which Weber had been named personally. Weber claimed that the statement to the press was actually a letter to the editor and that the ethics grievance was ultimately dismissed.
Brown v. Acrison was transferred to the federal court, and the suit ultimately settled. The terms of that settlement have not been included in the record.
Ricciardi claimed that, as a result of the broad media attention given to this lawsuit when it was first filed, he was humiliated and his colleagues and customers asked him if the allegations were true. He asserted that the accusations against him were false and that they had a profound impact on his reputation. Specifically, he contended that Acrison relied heavily on the ability of independent sales representatives to promote its products. Because some of these representatives believed the allegations against Ricciardi could be true, they doubted whether they would be able to effectively promote Acrison's products. Although these representatives eventually concluded that the allegations were false, Ricciardi's good name and reputation were purportedly tarnished.
Ricciardi supported these allegations with the certifications of James Kocher and Justin F. Joaquin, Jr. Kocher was an independent manufacturer's representative in the bulk solids handling industry who sold Acrison's products. He read one of the newspaper articles about Brown's lawsuit which contained quotes from Weber *921 regarding Ricciardi asking Brown about his daughter's sex life and regarding mirrors or cameras being installed in the bathrooms. Kocher began to have serious doubts about whether he would be able to promote Acrison's products because the allegations reflected negatively on Ricciardi as a person and because news traveled fast in this highly specialized industry. Kocher was especially concerned because the statements about Ricciardi came from an attorney. Kocher eventually concluded that there was not much merit to Brown's claims.
Joaquin was also an independent sales representative. He had known Ricciardi for twenty years and always thought highly of him. He had read a newspaper article about the lawsuit that contained quotes from Weber saying that Ricciardi constantly taunted Brown about sex. Joaquin had also seen Weber on television. He was concerned that the allegations might be true, especially because Weber was an attorney. He also received calls from concerned customers. If the allegations were true, Joaquin stated, he would not have been able to continue to promote Acrison's products because the company would have been "blackballed." Ultimately, Joaquin decided to continue to sell Acrison's products; however, he still had lingering doubts about Ricciardi and was afraid it could happen again.
In his answers to interrogatories, Ricciardi also named two other representatives, Alan Neumann and John Fairbairn, who took a dim view of Ricciardi following the allegations. In addition, Michael Rella was about to accept an offer of re-employment with Acrison when he heard the allegations. As a result, he withheld his acceptance of the offer until he became convinced the allegations were untrue. Lingering questions about Ricciardi still made Rella uncomfortable.
Although Acrison and Ricciardi alleged slander per se, they also alleged that they suffered actual loss to their reputation. They did not allege that they lost any profits or income.
In addressing defendants' summary judgment motion, the trial judge found that the statements Weber made to the print and broadcast media were subject to a qualified privilege, because they concerned a matter of legitimate public concern.
The judge also noted that Brown's claims were relatively novel and of particular interest to the public since they involved same-sex harassment, a question appellate courts had not yet squarely addressed. The number of reports in the print media, from Boston to Orlando, plus the televised reports in the New York area, provided additional evidence that there was broad public interest in Brown's suit.
Once the statements made in the lawsuit were subject to a qualified privilege, plaintiffs had to prove actual malice, i.e., clear and convincing evidence that Weber knew the statements were false or published them with reckless disregard as to whether they were true or false. The judge concluded that plaintiffs had not met this high evidentiary burden.
With respect to Weber's statement that Ricciardi asked Brown about his daughter's sex life, the judge acknowledged that this statement was not made directly to Brown but to the daughter's boyfriend in Brown's presence. Nevertheless, the inference could be drawn that Ricciardi intended for his inquiry to be heard by Brown. The evidence thus did not rise to the level of clear and convincing proof that Weber uttered this remark knowing it was false or with serious doubts about its truth.
*922 With regard to the statement about cameras and mirrors in the bathrooms, Brown did have evidence to support this allegation. Before filing suit, Brown told Weber that he had seen a camera in the mens' room. While Brown did not want to involve Collins, a co-worker, in the lawsuit without Weber talking to him first, Brown did later amend his complaint to add this allegation. In addition, another co-worker, Mark Bober, testified in a deposition about this camera. Based on the information available to Weber at the time the Brown complaint was filed, the trial judge ruled there was insufficient evidence to say that Weber acted with actual malice in commenting about a claim recounted to him by his client.
With regard to Weber's statement that Ricciardi's harassment was "all of a sexual nature," the judge acknowledged that Brown had not alleged that all the harassment was sexual. That is, Brown had also alleged harassment because of the way he was performing his job. Nevertheless, the core of Brown's claims related to the pervasive sexual harassment in the workplace. The harassment based on job performance was the "last straw" after Brown suffered through years of taunts and comments about his sexuality. Hence, the judge concluded that Brown was claiming that his harassment was "Virtually `all about sex,'" and viewed in this context, Weber's statements were not substantially different from what Brown was claiming.
With regard to Weber's statement that the unemployment compensation board had determined that Brown left because of harassment, the judge acknowledged that the board never determined that Brown had been sexually harassed. In his complaint, Brown had never claimed otherwise. The trial judge concluded Weber's statement to the press was not misleading; rather, it was essentially accurate and tracked the claims asserted by Brown in his complaint.
With regard to Weber's statement that Brown asked Ricciardi to stop the harassment, the judge acknowledged that Brown denied ever asking Ricciardi to stop. Nevertheless, Brown did tell the reporters that the harassment got worse and worse over the years but that he did not complain because he needed the job. Hence, even if Weber's statement was not factually accurate, the judge could not say that Weber acted with actual malice. Regardless of whether Brown asked Ricciardi to stop or whether he let the harassment continue because of fear of losing his job, there was no evidence that Weber uttered a knowing and calculated falsehood.
With regard to Weber's statement that the Oncale decision made his case better, Weber had admitted that he did not read Oncale before filing suit. However, an attorney's assessment of the legal merits of his client's case is not defamatory, and whether Weber read Oncale was not relevant to the issue of actual malice.
With regard to Weber's statement that Brown was asking for one million dollars, the judge acknowledged that Brown denied discussing damages with Weber. Nevertheless, an attorney's statement of the amount of his client's claim is not defamatory, because it does not tend to lower the reputations of the adversaries to the suit.
With regard to the issue of damages, the trial judge noted that a defamation plaintiff whose claim is based on statements in the public interest cannot rely on the doctrine of presumed damages. Rather, such a plaintiff had to prove pecuniary and reputational harm, i.e., concrete proof that the statements caused third parties to lower their estimation of the plaintiffs. Moreover, plaintiffs were not entitled to rely on the slander per se doctrine because a *923 statement accusing an individual of sexual harassment did not fall within one of the recognized categories of that doctrine.
Plaintiffs admitted that they suffered no pecuniary loss, and the judge concluded that the certifications of Kocher and Joaquin fell short of proving reputational loss. Neither individual stated that he believed Weber's comments or that Ricciardi's reputation was diminished as a result of them, and both men continued to do business with Acrison. Moreover, there was sufficient information contained in the news reports concerning the sexual allegations to raise serious reservations on the part of these men, wholly aside from anything Weber said. Ultimately, neither Joaquin nor Kocher believed the statements made about plaintiffs.

I.
Plaintiffs contend that the court erred in granting summary judgment because it resolved genuine issues of fact in defendants' favor. Plaintiffs assert that the court erred in its application of the "clear and convincing" standard for actual malice because there were questions of fact regarding Weber's state of mind when he made the statements in question.
The law of defamation tries to achieve the proper balance between protecting one's reputation and protecting free speech. Rocci v. Ecole Secondaire Macdonald-Cartier, 165 N.J. 149, 155, 755 A.2d 583 (2000). A statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with the subject. Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 164-65, 735 A.2d 1129 (1999).
It has been recognized on numerous occasions that summary judgment is particularly appropriate for disposing of non-meritorious defamation suits. Rocci, supra, 165 N.J. at 158, 755 A.2d 583; Costello v. Ocean County. Observer, 136 N.J. 594, 605, 643 A.2d 1012 (1994); Sedore v. Recorder Publ'g Co., 315 N.J.Super. 137, 163, 716 A.2d 1196 (App.Div.1998). Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In determining whether an issue of fact is genuine, the court should consider the burden of persuasion which must be met at trial, the evidence submitted by the parties on the motion, and the legitimate inferences therefrom which favor the non-moving party. Ibid.
The essence of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995). If there exists a "single, unavoidable resolution of the alleged disputed issue of fact," that issue will be an insufficient basis upon which to deny summary judgment. Id. at 540, 666 A.2d 146. In addition, summary judgment should not be granted where a party's state of mind or intent is at issue, or where credibility determinations must be made. Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 291, 544 A.2d 377 (1988).
Plaintiffs have not challenged the court's ruling that the statements were fair comment upon a matter of public concern, or the conclusion that they had to prove actual malice. Rather, they challenge only the court's application of the actual malice standard to the facts of this case.
Notwithstanding the absence of a challenge to the qualified privilege, we believe *924 the trial judge applied an incorrect rationale to support the privilege. Instead of applying the "fair comment on a matter of public concern" standard, the "fair report on the content of a complaint" was the appropriate privilege to invoke; particularly where it was the attorney who was making the comments to the press and television correspondents. A discussion of the fair report privilege demonstrates its applicability.
The fair report privilege provides that publication of defamatory matter in a report of a judicial or other official proceeding is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported. Fortenbaugh v. N.J. Press, Inc., 317 N.J.Super. 439, 447-48, 722 A.2d 568 (App.Div.1999); Sedore, supra, 315 N.J.Super. at 151, 716 A.2d 1196; Restatement (Second) of Torts § 611 (1977). The privilege is an exception to the general rule that imposes liability for the republication of a defamatory statement. Costello, supra, 136 N.J. at 606, 643 A.2d 1012. The purpose of the privilege is to assure that those who report on judicial or other official proceedings will not be held responsible for the contents of their reports. Id. at 607, 643 A.2d 1012. The rationale is that members of the public might see and hear the statements for themselves, so the reporter is merely a substitute for the public eye. Ibid.
The fair report privilege is a qualified one, which means that the statement must be a full, fair, and accurate report of the proceeding in question. Ibid. It is for the court to determine as a matter of law whether the report is a full, fair, and accurate account, and this determination is an objective one. Ibid; Fortenbaugh, supra, 317 N.J.Super. at 448, 722 A.2d 568; Sedore, supra, 315 N.J.Super. at 152, 716 A.2d 1196. Although the account need not be exact in every immaterial detail, and although it is sufficient if it conveys to the listener or reader a substantially correct account, the report must nevertheless be fair. Costello, supra, 136 N.J. at 607-08, 643 A.2d 1012; Fortenbaugh, supra, 317 N.J.Super. at 448, 722 A.2d 568; Sedore, supra, 315 N.J.Super. at 157, 716 A.2d 1196.
Once this qualified privilege has been established, the burden then shifts to the plaintiffs to overcome the privilege by demonstrating that the statements were published with actual malice, i.e., either with knowledge that they were inaccurate or with reckless disregard for their truth or falsity. Sedore, supra, 315 N.J.Super. at 162, 716 A.2d 1196; see Costello, supra, 136 N.J. at 607, 643 A.2d 1012 (in case of report of official proceedings, no action will he except upon proof of malice); Sisler v. Gannett Co., Inc. 104 N.J. 256, 272 n. 3, 516 A.2d 1083 (1986) (report of official proceeding must be fair and accurate and made without malice).
Abuse of the privilege through actual malice must be shown by clear and convincing evidence. Sedore, supra, 315 N.J.Super. at 164, 716 A.2d 1196. It is a question for the jury. Feggans v. Billington, 291 N.J.Super. 382, 395, 677 A.2d 771 (App.Div.1996). When applying the actual malice standard through the prism of summary judgment, the court must consider whether, even when considering the evidence in the light most favorable to the plaintiff, reasonable factfinders could not find clear and convincing evidence of actual malice. Lynch, supra, 161 N.J. at 159, 735 A.2d 1129; Costello, supra, 136 N.J. at 618, 643 A.2d 1012. Essentially, the clear and convincing standard adds additional weight to a plaintiff's burden to defeat a summary judgment motion. Gray v. Press Communications, L.L.C., 342 N.J.Super. 1, 12, 775 A.2d 678 (App.Div.), *925 certif. denied, 170 N.J. 390, 788 A.2d 774 (2001).
Reckless disregard for the truth means that the statements were made with a high degree of awareness of their probable falsity or with serious doubts as to their truth. Lynch, supra, 161 N.J. at 165, 735 A.2d 1129. It must approach the level of publishing a knowing and calculated falsehood. Ibid. It has been recognized that the actual malice standard puts a premium on ignorance and encourages an irresponsible defendant not to inquire about the truth of the material he or she reports. Ibid.
With respect to Weber's statement that Ricciardi asked Brown about his daughter's sex life, this was not contained in the complaint. There was sufficient evidence for a jury to find, by clear and convincing evidence, that Weber made this statement with reckless disregard for its truth or falsity since Weber knew that the statement had not been made to Brown directly.
Weber admitted that he filed complaints without investigating their underlying allegations, especially where he had no reason to believe Brown was lying. He also admitted that he did this in order to promote swift settlement negotiations with the insurance carrier, and that he encouraged Brown to give an interview to the press because it would help his case. While those tactics may all be reasonable ones for an attorney to take, the attorney's tactics are not protected by a qualified privilege. Cf. Citizens State Bank of N.J. v. Libertelli, 215 N.J.Super. 190, 199, 521 A.2d 867 (App.Div.1987) (distribution to press of pleadings and other documents may be tactic chosen by litigators, but it is not immunized as part of judicial process). At the very least, even under the higher standard of clear and convincing evidence, Weber's conduct created an issue of fact for the jury to decide.
The same reasoning would apply to the majority of Weber's other statements. With respect to the statement about mirrors or cameras in the bathrooms, the original complaint did not mention this at all. Thus, it could not be fair reporting since it was not part of the complaint. It could also be viewed as the most damaging because it conveyed the image of an employer spying on its employees in a setting where privacy is a high priority.
Furthermore, Weber did not attempt to corroborate this allegation with Mike Collins until after Weber spoke to the press. Even then, Collins could not provide the necessary corroboration. Regardless, the relevant inquiry is what Weber knew at the time he spoke to the press. The issue on the summary judgment motion was not the truth of the statements, but Weber's state of mind at the time he uttered them. Thus, it was not relevant that the cameras were in fact subsequently corroborated by others. Nevertheless, while it has been held that the failure to investigate fully is not sufficient by itself to prove actual malice, the failure to pursue the most obvious available sources for corroboration may be clear and convincing evidence of it. Costello, supra, 136 N.J. at 615, 643 A.2d 1012. Given the other evidence discussed above, regarding Weber's motives in speaking to the press, the court should not have decided this issue as a matter of law.
With regard to Weber's statements that Ricciardi's harassment was "all of a sexual nature" and that the unemployment compensation board found that Brown had been harassed, these too were not fair and accurate reports of the complaint. The complaint alleged non-sexual harassment and also alleged that Brown left his employment for reasons other than the sexual atmosphere at the plant. While it is enough that a report convey to the listener a substantially correct account of the judicial proceeding, the report should not be edited in such a way as to render it misleading. *926 Id. at 607-08, 643 A.2d 1012. Here, Weber's statements misled the listener into believing that Brown left his employment because the sexual harassment was so pervasive that he could not take it anymore. That was clearly not the case.
For the same reason, we disagree with the court's application of the actual malice standard with respect to these statements. Brown's leaving his job because Ricciardi yelled at him in front of his co-workers was not as important to Weber's settlement interests as was Brown's allegation that his male supervisor taunted him about sex. For that reason, it cannot be said that no reasonable juror could have found that Weber made his statement with actual malice. From Weber's standpoint, whether the case was "all about sex" or only "mostly about sex" made a difference.
With regard to Weber's statement that Brown asked Ricciardi to stop the harassment, this was not a fair report of the complaint. The complaint alleged only that Brown's employer had reason to know of the harassment and failed to provide adequate means to deal with such situations. Moreover, there was evidence that Brown never told Weber that he asked Ricciardi to stop. Again, the distinction between the two allegations is crucial in terms of Weber's settling and litigating this case. We cannot agree with the court that there was insufficient evidence that Weber uttered this statement with actual malice.
With regard to Weber's statement that Oncale made Brown's case better, this was not within the fair report privilege. However, whether Weber read that decision was irrelevant to the question of whether it supported Brown's case. Even if Weber had been told by someone else of the Oncale decision, he could have reasonably concluded that it would help Brown's case.
With regard to Weber's statement that Brown was asking for one million dollars, this was not contained within the pleadings and, therefore, outside the fair report privilege. Nonetheless, it cannot be said that Weber uttered this statement with actual malice because damages are often determined by the attorney's assessment of the case.
In sum, summary judgment was inappropriately granted. Sufficient evidence to show that Weber uttered the statements with actual malice was provided to withstand summary judgment.

II.
Plaintiffs contend that they were entitled to a presumption of damages because Weber's statements constituted slander per se since they accused Ricciardi of serious sexual misconduct or of engaging in criminal conduct. Alternatively, they contend that they sufficiently proved that their reputation was harmed.
One element of a defamation plaintiff's prima facie case is that the plaintiff was harmed by the alleged defamation. McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J.Super. 303, 313, 751 A.2d 1066 (App.Div.2000). In an action for slander, or oral defamation, the plaintiff must prove that the defamatory statement caused actual harm to his or her reputation through the production of concrete proof. Ward v. Zelikovsky, 136 N.J. 516, 540, 643 A.2d 972 (1994); McLaughlin, supra, 331 N.J.Super. at 308, 751 A.2d 1066. The plaintiff must prove special damages in the form of proof of pecuniary or economic harm to his reputation. Ward, supra, 136 N.J. at 540, 643 A.2d 972; Pitts v. Newark Bd. of Educ., 337 N.J.Super. 331, 337, 766 A.2d 1206 (App. Div.2001). By contrast, in an action for written defamation, or libel, the plaintiff may prove any form of actual damage to reputation, either pecuniary or non-pecuniary. *927 Biondi v. Nassimos, 300 N.J.Super. 148,153, 692 A.2d 103 (App.Div.1997).
This element of the slander plaintiff's prima facie case is waived if the statement is deemed slander per se, because damage to reputation is presumed to flow from such statements. McLaughlin, supra, 331 N.J.Super. at 308, 751 A.2d 1066. This means that a slander plaintiff may establish a cause of action not only without proving special damages but without proving any form of actual damage to reputation. Biondi, supra, 300 N.J.Super. at 154, 692 A.2d 103.
Four types of slander qualify as slander per se: (1) accusing another of having committed a criminal offense; (2) accusing another of having a loathsome disease; (3) accusing another of engaging in conduct, or having a condition or trait, incompatible with his or her business; and (4) accusing another of having engaged in serious sexual misconduct. McLaughlin, supra, 331 N.J.Super. at 314, 751 A.2d 1066; Biondi, supra, 300 N.J.Super. at 154, 692 A.2d 103. However, the slander per se doctrine has been criticized in recent years, resulting in the courts' refusal to expand any of these four categories or to invoke the doctrine unless it "clearly" applies. McLaughlin, supra, 331 N.J.Super. at 319, 751 A.2d 1066; Biondi, supra, 300 N.J.Super. at 154-57, 692 A.2d 103.
In Pitts v. Newark Bd. of Educ., supra, this court ruled that even if the defamatory oral statements in question had constituted slander per se, the plaintiff was still required to prove actual damages because the matter involved one of public concern. 337 N.J.Super. at 338, 766 A.2d 1206. Relying on Rocci, we held in Pitts that, in such a case, damages will not be presumed and the plaintiff must prove actual damages. Ibid. Notwithstanding Pitts, the statements made by Weber did not fall within the categories identified by plaintiffs because the statements leveled against Ricciardi failed to satisfy either the serious sexual misconduct or criminal offense categories constituting slander per se.
Sexual harassment by words alone has never been deemed sexual misconduct, much less serious sexual misconduct. Hence, Weber's statements that Ricciardi was constantly asking his subordinates about their sex lives did not fall within this category. Even the statement regarding mirrors or cameras in the bathrooms would not fall within this category. Rather, the category has traditionally been limited to statements imputing unchastity, adultery, or fornication to women. Restatement (Second) of Torts, supra, § 574, comment (b) at 196. Even if the category should apply to statements made about men as well, the statements here simply did not concern the type of conduct to which the doctrine was meant to apply. This is especially so when the doctrine should be construed narrowly and should not be invoked unless it "clearly" applies.
Neither did Weber's statements satisfy the criminal offense category of slander per se. The conduct of which Ricciardi was accused did not constitute harassment in violation of N.J.S.A. 2C:33-4; if it did, all employers found liable under LAD would be subject to criminal liability. Nor did plaintiffs prove slander per se because the comment about the mirrors in the bathroom was published in a Philadelphia newspaper and because invasion of privacy is a criminal offense under Pennsylvania law. The Philadelphia newspaper that printed the statement is not the defendant. Rather, the New Jersey attorney who made the statement in New Jersey about a New Jersey employer and New Jersey resident is. Just because the conduct in question may have constituted a criminal offense in a state where the statement was *928 subsequently republished does not make the statement slander per se.
However, defendant's statements constituted slander per se because they affected plaintiffs' business, trade, profession or office. Restatement (Second) of Torts, supra, § 573. To fall within this category, the statement must be of such a character as to disparage the plaintiff in pursuit of his business, trade, profession, or office, or tend to harm him in it. Ibid. The words must affect the plaintiff in a way that is peculiarly harmful to one engaged in his trade. Disparagement of a general character, which is equally discreditable to all persons, is not enough. Id., comment (e) at 194.
Here, Ricciardi was accused of sexually harassing one of Acrison's employees. The statements affected them in the conduct of their trade because it went to the essence of their character as employers. This might have been a different case had Ricciardi been accused of sexually harassing someone outside the workplace. However, because he was accused of such conduct with one of his subordinates, the statements fell within this particular category of slander per se.
In the alternative, plaintiffs still presented sufficient proof of actual harm to reputation to withstand a motion for summary judgment. They proved that existing relationships with their independent sales representatives were seriously disrupted or that their reputations were diminished in the view of these third parties. Under Ward v. Zelikovsky, supra, we believe this was enough.
Lowered social standing and its purely social consequences are not enough to prove special damages. Ward, supra, at 136 N.J. 516. Furthermore, it is not sufficient if the plaintiff merely proves that his feelings were hurt or he suffered embarrassment. McLaughlin, supra, 331 N.J.Super. at 313, 751 A.2d 1066. There also can be no defamation if the recipients of the alleged defamation did not believe the statements. Ibid. (citing Nanavati v. Burdette Tomlin Mem'l Hosp., 857 F.2d 96, 109 (3d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L. Ed.2d 834 (1989)).
Here, however, plaintiffs alleged more than social embarrassment or hurt feelings. They provided the certifications of two sales representatives which indicated that these individuals did question the truth of the allegations and that they entertained serious doubts about whether to continue to associate with plaintiffs on a business level. At the summary judgment stage, these proffers of proof were sufficient.
Although the motion judge noted that plaintiffs were not harmed any more by the defamatory statements than they were by the filing of the harassment complaint itself, that would be for the jury to determine. A jury might conclude that, had Weber not spoken to the press about the complaint and falsely embellished Brown's allegations, the harassment litigation would not have done as much damage to plaintiffs' reputations.
In sum, the defamatory statements constituted slander per se because they affected plaintiffs in their business or trade, or alternatively that plaintiffs provided sufficient proof of actual damage to their reputations to withstand summary judgment.
Reversed and remanded.